**SEVEN INVESTMENTS, LLC, for itself and derivatively on behalf of Canvas Companies, LLC, Plaintiff,**

v.

**AD CAPITAL, LLC and Abraxas J. Discala, Defendants,**

and

**Canvas Companies, LLC, Nominal Defendant.**

**C.A. No. 6449–VCL.**

Court of Chancery of Delaware.

Submitted: Sept. 30, 2011.
Decided: Nov. 21, 2011.

---

Theodore A. Kittila, Jonathan M. Stemerman, Elliott Greenleaf, Wilmington, Delaware, Attorneys for Plaintiff.

Colm F. Connolly, Ramy E. Hanna, Morgan, Lewis & Bockius LLP, Wilmington, Delaware, Scott T. Schutte, Jayesh Hines–Shah, Morgan, Lewis & Bockius LLP, Chicago, Illinois, Attorneys for Defendants.

## *OPINION*

LASTER, Vice Chancellor.

Plaintiff Seven Investments, LLC and defendant AD Capital, LLC agreed to combine their investment management operations into a single firm to be known as Canvas Companies, LLC. After coming to believe that AD Capital was engaged in fraud, Seven Investments terminated the arrangement. In a formal termination agreement dated as of April 3, 2009 (the "Termination Agreement" or "TA"), Seven Investments agreed to pay certain enumerated expenses, and the parties granted each other expansive global releases. In this action, Seven Investments asserts wide-ranging claims against AD Capital and its managing member, defendant Abraxas J. Discala. The defendants have moved to dismiss the complaint in reliance on the general release in the Termination Agreement. I hold that the release bars Seven Investments' claims.

## I. FACTUAL BACKGROUND

The facts for purposes of the motion to dismiss are drawn from the verified complaint dated May 4, 2011 (the "Complaint") and the documents it incorporates by reference, which include the Termination Agreement and other material agreements between the parties.

### A. The Joint Venture

Non-party Mark H. Robbins, the manager of Seven Investments, is an entrepre-

neur from Salt Lake City who grew Seven Investments into a successful investment management business. During late 2008 and early 2009, Robbins had a series of meetings with Discala, who portrayed himself as a similarly successful financier from New York. Robbins came to believe that Discala's company, AD Capital, was "flush with valuable assets" and "familiar with ready investors." Compl. ¶ 14. Discala convinced Robbins that they should combine their companies to reach a "new level." *Id.*

To implement the combination, Seven Investments and AD Capital executed an Agreement to Form Limited Liability Company and Contribution Agreement dated January 30, 2009 (the "Contribution Agreement"). The Contribution Agreement called for Seven Investments and AD Capital to contribute their assets and liabilities to Canvas Companies, a newly formed Delaware limited liability company. The operating agreement of Canvas Companies (the "LLC Agreement") named Discala as Canvas Companies' sole manager.

## B. The Falling Out

Within weeks after executing the Contribution Agreement, Robbins came to believe that Discala misrepresented at least two critical facts: first, that AD Capital could contribute $18 million of unencumbered assets, and second, that Discala had a network of investors from which he could raise up to $12 million. Robbins discovered that AD Capital's assets were pledged to secure other debts, that Discala did not have a network of investors, and that Discala and AD Capital were being investigated for fraud by the Federal Bureau of Investigation and the Internal Revenue Service. "In February 2009, Robbins learned that Discala was not operating Canvas Companies as agreed but instead was misusing Canvas Companies as a front

to raise money to pay off his own personal debts, including gambling and other debts." Compl. ¶ 21. As a result of these and other developments detailed in the Complaint, "Seven Investments' and Robbins' confidence in AD Capital and Discala and their representations was irretrievably shaken. . . ." Compl. ¶ 25.

## C. The Termination Agreement

"On March 27, 2009, knowing there was enough smoke to detect a possible fire, Seven Investments sent a Notice of Termination of Agreement to AD Capital exercising its right under the Contribution Agreement to terminate the joint venture if no investors had been secured by March 15." Compl. ¶ 26. Discala responded that he had done nothing wrong and had spent substantial funds in pursuit of the joint venture. Compl. ¶ 27.

On April 9, 2009, Seven Investments and AD Capital entered into the Termination Agreement, effective as of April 3, 2009, which dissolved Canvas Companies and released all of the parties' obligations under the "Canvas Agreements," defined to include the Contribution Agreement, the LLC Agreement, and other agreements pre-dating the Termination Agreement. The Termination Agreement provided for Seven Investments to pay approximately $579,000 "to satisfy all of the outstanding payment obligations of [Canvas Companies] as set forth on *Schedule A.*" TA § 2.4(a). Schedule A listed specific amounts owed to identified persons or entities and provided a short description of the expense. The Complaint refers to these amounts as the "Purported Accumulated Expenses." At the time, Robbins already believed that "Discala was not operating Canvas Companies as agreed but instead was misusing Canvas Companies as a front to raise money to pay off his own personal debts, including gambling

and other debts." Compl. ¶ 21. The possible illegitimacy of some or all of the Purported Accumulated Expenses was therefore squarely on the table. The Termination Agreement further recognized the possibility of disputes by providing that in the event of a disagreement with a listed creditor, "Seven and AD Capital shall promptly resolve that dispute." TA § 2.4(c).

In the Termination Agreement, Seven Investments and AD Capital granted each other general releases. Seven Investments' release in favor of AD Capital provided as follows:

> Upon full compliance with and performance of the terms stated herein, Seven, for itself and, to the fullest extent allowed by law, on behalf of those claiming through Seven, including its members, managers, officers, directors, predecessor entities, successors and assigns, parents, subsidiaries, affiliates and employees (collectively, the "Seven Releasing Parties"), hereby agree to and shall release and discharge AD Capital and its subsidiaries and affiliates, and their respective managers, directors, officers, employees, shareholders, members, predecessors, heirs, successors, assigns, agents and representatives (collectively, the "AD Capital Released Parties"), from any and all claims, liabilities, demands and causes of action known or unknown, fixed or contingent, except for any obligations created by this Agreement, that they now have against the AD Capital Released Parties or that might subsequently accrue to them against any of the AD Capital Released Parties by reason of any matter or thing arising out of or in any way related with any Canvas Agreement (collectively, the "Seven Released Claims" and together with the AD Released Claims, the "Released Claims"). Notwithstanding anything to the contrary herein, Seven is not releasing or discharging AD Capital from any obligation created by this Agreement.

TA § 2.3 (the "General Release").

To amplify the release of claims "known or unknown," the parties acknowledged in Section 3.1 of the Termination Agreement that they each intended "to give a full and complete release and discharge of the Released Claims," notwithstanding that "they may be unaware of or may discover facts in addition to or different from those which they now know or believe to be true related to or concerning the Released Claims or the Released Persons." TA § 3.1. The parties further acknowledged "that such presently unknown or unappreciated facts could materially affect the claims or defenses of a party or parties and the desirability of entering into this Agreement." *Id.* Each party also acknowledged that it entered into the Termination Agreement voluntarily, understood its implications, and acted with the "assistance of separate counsel in carefully reviewing, discussing, and considering all the terms." TA § 4.1(a)-(b).

## D. The Litigation

On May 4, 2011, over two years after entering into the Termination Agreement, Seven Investments filed this action. The Complaint alleges that the expenses Seven Investments agreed to pay on behalf of Canvas Companies were "fraudulent" because they "had not actually been placed into or incurred by the joint venture." Compl. ¶ 29. Rather, these expenses were "run up by Discala and AD Capital during their fraudulent operations and misuse of the joint venture as a front" and were either "purely fictitious" or resulted from Discala and AD Capital taking money from associates but then not investing it in Canvas Companies. Compl. ¶¶ 29, 31.

The Complaint asserts four counts. Count I seeks "a declaration that Seven Investments' obligations pursuant to the Termination Agreement are excused due to the Defendants' fraud." Compl. ¶ 50. Alternatively, Count I seeks a declaration that the Contribution Agreement, the LLC Agreement, and other agreements pre-dating the Termination Agreement are null and void. Count II asserts a claim for common law fraud based on three misrepresentations: "(i) AD Capital had $18 million in free and clear assets ..., (ii) Discala could and would raise additional financing ... of up to $12 million, and (iii) the Purported Accumulated Expenses were valid business expenses of Canvas Companies." Compl. ¶ 55. Count III seeks to recover amounts paid for the Purported Accumulated Expenses under a theory of unjust enrichment. Count IV alleges that as manager of Canvas Companies, Discala breached his fiduciary duties by misleading Seven Investments, acting selfishly, and misappropriating Canvas Companies funds. The defendants have moved to dismiss the Complaint in reliance on the General Release.

## II. LEGAL ANALYSIS

 A complaint should be dismissed if it fails to state a claim on which relief could be granted. *See* Ct. Ch. R. 12(b)(6). The defendants' motion turns on whether the General Release encompasses the claims asserted in the Complaint. The existence of a release is an affirmative defense that must be asserted in a responsive pleading. *See* Ct. Ch. R. 8(c). The General Release nevertheless can be considered on a Rule 12(b)(6) motion because the Complaint incorporates the Termination Agreement by reference. *See, e.g., Meer v. Aharoni,* 2010 WL 2573767, at *3 (Del.Ch. June 28, 2010) ("In evaluating defendant's motion to dismiss, the Court may also consider the unambiguous terms of the Original and Amended Stipulations, the Proposed Settlement, and the Release, which are integral to the complaint and the resolution of this motion."); *Canadian Commercial Workers Indus. Pension Plan v. Alden,* 2006 WL 456786, at *2 n. 9 (Del.Ch. Feb. 22, 2006) ("The Court may consider the Release in deciding a motion to dismiss because the Complaint makes reference to it.").

 "[A]n effective release terminates the rights of the party executing and delivering the release and ... is a bar to recovery on the claim released." *Hicks v. Soroka,* 188 A.2d 133, 138 (Del.Super.1963) (citing *Hob Tea Room v. Miller,* 89 A.2d 851, 856 (Del.1952)). When determining whether a release covers a claim, "the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document." *Corporate Prop. Assocs. 6 v. Hallwood Gp. Inc.,* 817 A.2d 777, 779 (Del.2003) (quoting *Adams v. Jankouskas,* 452 A.2d 148, 156 (Del.1982)). "[W]here the language of the release is clear and unambiguous, it will not lightly be set aside." *Adams,* 452 A.2d at 156. If the claim falls within the plain language of the release, then the claim should be dismissed. *See, e.g., Deuley v. DynCorp Int'l, Inc.,* 8 A.3d 1156, 1163–65 (Del.2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 2119, 179 L.Ed.2d 894 (2011) (affirming Rule 12(b)(6) dismissal based on release).

 When a plaintiff asserts that the release itself was induced by the defendant's fraud, "the party seeking enforcement of the release bears the burden of proving that the released fraud claim was within the contemplation of the releasing party." *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage,* 744 A.2d 457, 461 (Del.1999). As in other circumstances

where the law places the burden of proof on the defendant, this allocation does not preclude the granting of a motion to dismiss.[1] Nor does the *DuPont* case require that the Court credit a bare allegation that a release was induced by fraud and therefore deny a motion to dismiss in the face of (i) the plain language of the release or (ii) allegations in the complaint that establish the defense or rule out any other reasonably conceivable inference. Rather, " '[w]hen a motion to dismiss relies upon affirmative defenses, such as waiver and release, the Court may dismiss a claim if the plaintiff includes in its pleadings facts that incontrovertibly constitute an affirmative defense to a claim.' " *Canadian Commercial Workers,* 2006 WL 456786, at *3 (quoting *Capano v. Capano,* 2003 WL 22843906, at *2 (Del.Ch. Nov. 14, 2003)).

■■■ "Delaware courts recognize the validity of general releases." *Deuley,* 8 A.3d at 1163. Such a release "is intended to cover everything—what the parties presently have in mind, as well as what they do not have in mind." *Corporate Prop. Assocs.,* 817 A.2d at 779 (quoting *Hob Tea Room,* 89 A.2d at 856). "[G]eneral releases are in common use, and their potency, if it renders them too dangerous for careless handling, is at the same time a constant boon to business and courts." *Hob Tea Room,* 89 A.2d at 856. They are an important tool for settling disputes precisely because they are designed to provide "complete peace." *In re Philadelphia Stock Exch., Inc.,* 945 A.2d 1123, 1137 (Del. 2008). "Indeed, settlement is often not possible without granting such 'global peace'. . . ." *In re Countrywide Corp. S'holders Litig.,* 2009 WL 846019, at *10 (Del.Ch. Mar. 31, 2009).

■■■ The General Release explicitly extinguished all claims, known or unknown, arising out of or in any way related to the Canvas Agreements. In Section 3.1 of the Termination Agreement, the parties took pains to express affirmatively (albeit redundantly) their intention to extinguish all claims, recognizing that (i) "they may be unaware of or may discover facts in addition to or different from those which they now know or believe to be true" and (ii) "such presently unknown or unappreciated facts could materially affect the claims or defenses of a party or parties and the desirability of entering into this Agreement." TA § 3.1.

On its face, the broad and unambiguous language of the General Release encompasses all of the claims asserted in the Complaint. Count I seeks a declaration that the Contribution Agreement, the LLC Agreement, and other agreements pre-dating the Termination Agreement are null and void. The General Release extin-

---

1. *See, e.g., Ravenswood Inv. Co. v. Winmill,* 2011 WL 2176478, at *4 (Del.Ch. May 31, 2011) (dismissing claim where defendants had the burden of proving entire fairness but the plaintiff "has not alleged facts suggesting unfairness"); *Monroe Cty. Empls.' Ret. Sys. v. Carlson,* 2010 WL 2376890, at *2 (Del.Ch. June 7, 2010) (dismissing claim where defendants had the burden of proving entire fairness but the plaintiff failed to "make factual allegations about the transaction in the complaint that demonstrate the absence of fairness"); *Binks v. DSL.net, Inc.,* 2010 WL 1713629, at *7, *9–10 (Del.Ch. Apr. 29, 2010) (dismissing claims the court assumed were subject to enhanced scrutiny under *Revlon* ); *In re Boston Celtics Ltd. P'ship S'holders Litig.,* 1999 WL 641902, at *5–6 (Del.Ch. Aug. 6, 1999) (dismissing dilution claim governed by entire fairness test where a statement in plaintiffs' answering brief "contradicts Plaintiffs' allegation that the Reorganization diluted their equity interest"); *In re Wheelabrator Techs. Inc. S'holders Litig.,* 1992 WL 212595, at *8 (Del. Sept. 1, 1992) (dismissing claims where, "even assuming . . . that *Revlon* duties were triggered . . ., no facts are alleged that support a cognizable claim that those duties were breached here").

guished this count by releasing "all claims, liabilities, demands and causes of action known or unknown, . . . arising out of or in any way related with any Canvas Agreement." TA § 2.3.

Count II asserts a claim for common law fraud based on three misrepresentations: "(i) AD Capital had $18 million in free and clear assets . . ., (ii) Discala could and would raise additional financing . . . of up to $12 million, and (iii) the Purported Accumulated Expenses were valid business expenses of Canvas Companies." Compl. ¶ 55. Items (i) and (ii) were part of the underlying deal to form Canvas Companies that was memorialized in the Contribution Agreement. As noted above, the General Release encompassed and extinguished "all claims, liabilities, demands and causes of action known or unknown, . . . arising out of or in any way related with any Canvas Agreement." TA § 2.3.

The fraud claim based on the Purported Accumulated Expenses also is encompassed by the General Release. Assuming for sake of argument that Seven Investments and Robbins truly believed at the time of the Termination Agreement that the expenses were legitimate, the possibility that the expenses were fraudulent was nevertheless a claim, albeit an "unknown" and arguably "contingent" claim, that fell within the scope of the General Release. Regardless, the Complaint alleges in plain terms that Seven Investments and Robbins suspected that at least some of the Purported Accumulated Expenses were fraudulent. According to the Complaint, Seven Investments became concerned in February 2009 that Discala "was misusing Canvas Companies as a front to raise money to pay off his own personal debts, including gambling and other debts." Compl. ¶ 21. As a result, "Seven Investments' and Robbins' confidence in AD Capital and Discala and their representa-

tions was irretrievably shaken." Compl. ¶ 25. Seven Investments therefore was on notice at the time it entered into the Termination Agreement that the Purported Accumulated Expenses were possibly fraudulent, accepted that risk under the terms that were negotiated, and released its right to pursue that claim as part of the package of consideration exchanged by the parties.

Because Seven Investments released all claims relating to the Purported Accumulated Expenses, Seven Investments cannot bring its claim in Count III to recover the amounts paid under a theory of unjust enrichment. Seven Investments' effort to repackage all of its claims under a breach of fiduciary duty theory is likewise barred. Discala became a fiduciary of Canvas Companies in accordance with the Contribution Agreement and under the LLC Agreement. The General Release extinguished all claims arising out of or relating to these agreements.

In an effort to avoid the expansive scope of the General Release, Seven Investments cites language carving out "any obligations created by" the Termination Agreement. According to Seven Investments, this language would permit a fraud claim based on the Purported Accumulated Expenses, which are obligations created by the Termination Agreement. To the contrary, this customary exclusion preserves the parties' right to enforce the Termination Agreement as a contract and eliminates any suggestion that the General Release extended to the right to enforce the agreement itself. The Complaint does not assert a claim for breach of contract or attempt to enforce the Termination Agreement *qua* contract. Seven Investments chose instead to sue for fraud based on wrongs allegedly committed prior to or in connection with the execution of the Termination Agreement. Those claims are

barred by the General Release. I need not speculate on whether Seven Investments could have framed a viable claim for breach of contract. I also need not speculate on whether Discala might have labored under an affirmative duty of disclosure when negotiating the Termination Agreement because of his fiduciary role at Canvas Companies. Seven Investments did not advance this theory, which is therefore waived.[2]

Dismissing the plaintiff's claims in this case comports with the Delaware Supreme Court's holding in *DuPont*. In that decision, the Delaware Supreme Court answered a question of law certified by the United States District Court for the Southern District of Florida. The *DuPont* plaintiffs had filed a products liability action in October 1992 alleging that Benlate, a DuPont fungicide, was defective and damaged their plants and nursery. *DuPont*, 744 A.2d at 458. In May 1994, the parties settled, with DuPont paying the plaintiffs $2.3 million in exchange for a general release of claims against DuPont. *Id.* at 458–59. Over four years later, the plaintiffs brought a second suit against DuPont, alleging that they were fraudulently induced to enter into the settlement agreement because DuPont (i) "wrongfully, illegally, and fraudulently withheld from discovery vital scientific data and information that DuPont was under an obligation to produce," (ii) "gave false testimony in

other Benlate cases about the product's alleged defects and about scientific tests of Benlate," and (iii) "withheld ... data and information and made false statements in implementation of a scheme to defraud Plaintiffs and others who had used Benlate and suffered resulting damage." *Id.* at 459.

The Delaware Supreme Court held that the complaint's allegations were sufficient, at the pleadings stage, to state a cause of action for fraud in the inducement that could void the release. Importantly, the "very essence of the fraud" was "the separate conduct of DuPont in creating a false representation and inducing reliance thereon after the litigation commenced." *Id.* at 462. This conduct was "a wrong not only as to the releasing party but to the court as well." *Id.* at 461. The Delaware Supreme Court therefore readily and appropriately credited the reasonable inference that the plaintiffs had not contemplated releasing a fraud claim "different sequentially and conceptually" from the products liability claims contemplated by the release. *Id.* at 462.

The *DuPont* decision does not prevent parties from executing general releases that extinguish claims for fraud, including claims for fraud in the inducement, particularly where the party granting the release is on notice of potential fraud claims. Lawsuits involving allegations of fraud often must be settled even though

---

**2.** *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del.1999) ("Issues not briefed are deemed waived."). Cases from other jurisdictions have imposed different and often higher standards when a fiduciary negotiates a release. *See, e.g., Wal–Mart Stores, Inc. v. Coughlin*, 369 Ark. 365, 255 S.W.3d 424, 429 (2007) ("[A] significant majority of other jurisdictions, both state and federal, have held that a fiduciary owes a duty of full disclosure when entering into a transaction with the fiduciary's corporation and that the fiduciary's failure to disclose material facts relating

to a mutual release of claims between the parties is sufficient to set aside the release."). *But see Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 929 N.Y.S.2d 3, 952 N.E.2d 995, 1001 (2011) ("A sophisticated principal is able to release its fiduciary from claims—at least where ... the fiduciary relationship is no longer one of unquestioning trust—so long as the principal understands that the fiduciary is acting in its own interest and the release is knowingly entered into." (citations omitted)). I intimate no opinion on this interesting question.

the parties disagree about whether false or misleading representations were made. Settlement would be impossible if a party could later rescind a release based on the same or similar fraud allegations. A negotiated release would merely become the starting point for further litigation. *Cf. Abry P'rs V, L.P. v. F & W Acq. LLC,* 891 A.2d 1032, 1062 (Del.Ch.2006) (noting in the context of exclusive remedy provision that "[p]ermitting a party to sue for relief that it has contractually promised not to pursue creates the possibility that buyers will face erroneous liability ... and uncompensated costs"). In *DuPont,* the Delaware Supreme Court acknowledged that a successful claim for fraudulently inducing a general release would be "rare and exceptional." 744 A.2d at 461. Although not controlling, well-reasoned cases interpreting New York law take a similar approach and recognize that general releases are not readily vulnerable to fraud-in-the-inducement claims.[3]

Seven Investments' agreement to pay the Purported Accumulated Expenses—which Seven Investments already suspected might be fraudulent—was part of the negotiated resolution of a business dispute by sophisticated parties, acting with the advice of separate counsel. Unlike in *DuPont,* the alleged fraud on which Seven Investments relies was not "different sequentially and conceptually" from the fraud that was the subject of the settlement. 744 A.2d at 462. Seven Investments' current claim for fraud represents an attempt to revive and litigate the very

issues that led to the termination of the joint venture and which were resolved by the Termination Agreement.

█ This leaves two remaining issues. First, the General Release is not rendered unenforceable because the parties have not filed a certificate of dissolution with the Delaware Secretary of State, as called for by Section 4.2 of the Termination Agreement. *See* TA § 4.2. Section 4.2 requires that "the Parties" file a certificate, thereby placing the obligation on both Seven Investments and AD Capital. Neither the Complaint nor the plaintiff's brief asserts that AD Capital has refused to cooperate in filing the certificate. Seven Investments simply observes that the certificate has not been filed. "Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused." Restatement (Second) of Contracts § 245 (1981); *cf. Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp.,* 1985 WL 11574, at *4 (Del.Ch. Aug. 27, 1985) ("The 'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent.").

█ Second, the Complaint does not state a claim for judicial dissolution of Canvas Companies pursuant to 6 *Del. C.* § 18–802. Other than the claims that were released by the Termination Agreement, Seven Investments has not advanced

---

3. *See Centro,* 929 N.Y.S.2d 3, 952 N.E.2d at 1000 ("[A] party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release. Were this not the case, no party could ever settle a fraud claim with any finality." (citation omitted)); *see also Alleghany Corp. v. Kirby,* 333 F.2d 327, 333 (2d Cir.1964), *aff'd on reh'g,* 340 F.2d 311 (1965) (en banc; per curiam),

*cert. dismissed,* 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 (1966) ("A settlement is the price of peace. There is no prerequisite to the settlement of a fraud case that the defendant must come forward and confess to all his wrongful acts in connection with the subject matter of the suit. Usually such settlements are accompanied by vigorous denials of any fraud whatsoever.").

any ground for judicial dissolution. The parties agreed in the Termination Agreement to dissolve Canvas Companies, making the proper claim one for breach of contract. That claim has not been asserted.

### III. CONCLUSION

Seven Investments' claims were released. The defendants' motion to dismiss is therefore granted. **IT IS SO ORDERED.**