# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

EYAL EPHRAT and
SONIA BEN-YEHUDA,

     Petitioners,

  v.

MEDCPU, INC.,

     Respondent.

C.A. No. 2018-0852-MTZ

## MEMORANDUM OPINION

Date Submitted: March 21, 2019
Date Decided: June 26, 2019

Douglas D. Herrmann, James H.S. Levine, and Ellis E. Herington, PEPPER HAMILTON LLP, Wilmington, Delaware; Jay A. Dubow, PEPPER HAMILTON LLP, Philadelphia, Pennsylvania; *Attorneys for Petitioners Eyal Ephrat and Sonia Ben-Yehuda*

Patricia L. Enerio and Aaron M. Nelson, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Adam P. Samansky, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPE, P.C., Boston, Massachusetts; Frank J. Earley and Andre Cizmarik, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPE, P.C., New York, New York; *Attorneys for Respondent medCPU, Inc.*

**ZURN, Vice Chancellor.**

The petitioners here, former officers and directors of the respondent, sued to enforce their rights to payments under a separation agreement. The company counterclaimed, alleging the petitioners had breached the separation agreement and had no right to payment. Petitioners seek advancement to defend themselves against the counterclaims. The parties cross-moved for summary judgment instead of trial. The motions present two issues.

The first is whether the post-separation conduct underlying the company's counterclaims is "by reason of the fact" of the petitioners' corporate status, or in breach of personal contractual obligations. In my view, it is a little of both. Although the conduct occurred after petitioners left their positions, some counterclaims focus on petitioners' use of confidential information they learned during their time at the company. I conclude the claims relating to those allegations warrant advancement, while petitioners' breach of personal contractual obligations do not.

Second, the company argues the petitioners released their claim for advancement in the separation agreement. I disagree, and hold the petitioners did not release their claims.

## I.  BACKGROUND

On the parties' cross-motions for summary judgment, the facts are drawn from the evidentiary record developed by the parties.

**A. Petitioners Were Officers, Directors, Employees, And Agents Of medCPU And Covered By An Advancement Provision.**

medCPU, Inc. (the "Company") is a Delaware corporation in the business of research, development, and commercialization of software related to electronic medical record systems.[1] Petitioners Eyal Ephrat and Sonia Ben-Yehuda (together, "Petitioners") founded medCPU in 2008, with Ephrat serving as its Chief Executive Officer and Ben-Yehuda as its President. Article SEVENTH of the Sixth Amended and Restated Certificate of Incorporation of medCPU, Inc. (the "Charter") states:

> The Corporation shall, to the fullest extent permitted by the provisions of Section 145 of the DGCL, as the same may be amended and supplemented, indemnify and advance expenses to any and all persons whom it shall have power to indemnify and advance expenses to, under said section from and against any and all expenses, liabilities or other matters referred to in or covered by said section, and the indemnification provided for herein shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any By-Law, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in their official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director, officer, employee, or agent and shall inure to the benefit of the heirs, executors and administrators of such a person. Any amendment, repeal or modification of the foregoing provisions of this Article SEVENTH shall not adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification. [2]

---

[1] Docket Item ("D.I.") 14 Answer ¶ 5.

[2] D.I. 1 Ex. A art. SEVENTH.

2

Petitioners each entered into Loyalty Agreements with the Company effective April 1, 2012.[3]  In relevant parts of the Loyalty Agreements, detailed below, Petitioners agreed to keep "Confidential Information of the Corporation" in "strictest confidence" and not to use or disclose that information.[4]

## B.    Petitioners Left medCPU And Executed Separation Agreements.

Petitioners were directors, officers, employees, and agents of medCPU until they left the Company on September 28, 2016 (the "Separation Date").  At that time, they entered into Separation Agreements.  The Separation Agreements contain "the entire agreement" between Petitioners and medCPU and "supersede[d] all prior agreements," while also incorporating the Loyalty Agreements:

> This Agreement and the Loyalty Agreement shall constitute the entire agreement and understanding of the parties with respect to the subject matter herein and supersedes all prior agreements, arrangements and understandings, written or oral, between the parties with respect to the subject matter herein, including the Employment Agreement. The Executive acknowledges and agrees that Executive is not relying on any representations or promises by any representative of the Company concerning the meaning of any aspect of this Agreement.[5]

---

[3] D.I. 14 Answer ¶ 8.

[4] D.I. 20 Ex. G § 1(a).

[5] D.I. 20 Exs. B & C § 16.

3

The Separation Agreements made clear the "covenants and obligations in the Loyalty Agreement[s] continue to apply in accordance with the terms of the Loyalty Agreement[s]."[6] Some of those include:

    A.   to hold in strictest confidence and not to disclose or use any of medCPU's "Confidential Information" (as defined in the Loyalty Agreement) and trade secrets;[7]

    B.   to return all medCPU Corporation Documents and Property;[8] and

---

[6] *Id.* § 9.

[7] *Id.* §§ 1(a). The Loyalty Agreements defined Confidential Information as follows:

> any [medCPU] proprietary or confidential information, technical data, trade secrets, know-how, including, but not limited to, research, product plans and developments, prototypes, products, services, client lists and clients (including, but not limited to, clients of [medCPU] on whom [Petitioners] call, from whom [Petitioners] provide services or with whom [Petitioners] become acquainted during the term of [Petitioners'] employment), prospective clients and contacts, proposals, client purchasing practices, prices and pricing methodology, cost information, terms and conditions of business relationships with clients, client research and other needs, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, distribution and sales methods and systems, sales and profits figures, finances, personnel information (including, but not limited to, information regarding compensation, skills and duties), as well as reports and other business information that [Petitioners] learn of, obtain, or that is disclosed to [Petitioners] during the course of [Petitioners'] employment, either directly or indirectly, in writing, orally, or by review or inspection of documents or other tangible property. However, Confidential Information does not include any of the foregoing items which has been made generally available to the public and become publicly known through no wrongful act of [Petitioners][.]

D.I. 20 Ex. G § 1(a).

[8] *Id.* § 3. "Corporation Documents and Property" includes:

> records, data, notes, reports, information, proposals, lists, correspondence, emails, specifications, drawings, blueprints, sketches, materials, other documents, or any reproductions or copies (including but not limited to on

4

C. for the 12-month period following their last date of employment with medCPU, not to, "directly or indirectly, in any capacity whatsoever, engage in . . . or have any connection with any business or venture that is engaged in any activities competing with the activities of" medCPU.[9]

And Petitioners agreed they would not:

(i) contact or attempt to contact (whether in person, by email, phone, or otherwise) the Company's employees, clients or potential clients, consultants, or advisors; (ii) enter, or attempt to enter, any of the Company's offices; (iii) access, or attempt to access, any of the Company's computer systems or electronic communication systems; (iv) take any action, or attempt to take any action, on behalf of the Company; or (v) represent to any person that the Executive has authority to act on behalf of the Company.[10]

Petitioners also had to "cooperate with the Company, and upon the Company's request, to (i) provide the Company with computer and/or system administrative access codes for the Company's computer and email systems; and (ii) transition the Company's clients and the Executive's responsibilities to other employees and advisors of the Company."[11]

---

computer discs or drives) of any of the aforementioned items either developed by me pursuant to [their] employment with [medCPU] or otherwise relating to the business of the Corporation, retaining neither copies nor excerpts thereof."

*Id.*

[9] *Id.* § 4(a).

[10] D.I. 20 Exs. B & C § 1.

[11] *Id.* § 2(b).

In exchange, medCPU agreed to pay Petitioners monthly separation payments for twelve months.[12] The Company had the right to stop paying Petitioners the monthly separation payments and recoup any money already paid to Petitioners under the Separation Agreements if the Petitioners breached either the Loyalty or Separation Agreements.[13]

The Separation Agreements provide a limited indemnification right for third-party claims:

> The Company agrees to indemnify, defend and hold harmless Executive *in connection with any claims by third parties that may be brought against Executive*, to the fullest extent permitted by the Company's articles of incorporation and/or bylaws. The Company agrees that it shall maintain directors and officers liability insurance coverage that shall cover claims against Executive to the same extent as its current officers and directors.[14]

But Petitioners agreed in the Separation Agreements to release a broad set of claims against medCPU, as well as "any and all claims for counsel fees and costs":

> The Executive . . . hereby agrees to irrevocably and unconditionally waive, release and forever discharge the Company, Insperity and its/their past, present and future affiliates . . . (collectively, the "Company Released Parties") from any and all waivable claims, charges, demands, sums of money, actions, rights, promises, agreements, causes of action, obligations and liabilities of any kind or nature whatsoever, at law or in equity, whether known or unknown, existing or contingent, suspected or unsuspected, apparent or concealed, foreign or domestic (hereinafter collectively referred to as

---

[12] *Id.* § 2(a).

[13] *Id.* § 9.

[14] *Id.* § 6 (emphasis added).

"claims") which he/she has now or in the future may claim to have against any or all of the Company Released Parties based upon or arising out of any facts, acts, conduct, omissions, transactions, occurrences, contracts, claims, events, causes, matters or things of any conceivable kind or character existing or occurring or claimed to exist or to have occurred prior to the date of the Executive's execution of this Agreement in any way whatsoever relating to or arising out of Executive's employment with the Company Released Parties or the termination thereof, including, without limitation, any right under the Employment Agreement. Such claims include, without limitation, . . . any other federal, state or local statutory laws relating to employment, discrimination in employment, termination of employment, wages, benefits or otherwise . . . any common law claims, including but not limited to actions in tort, defamation and breach of contract; any claim or damage arising out of Executive's employment with or separation from the Company Released Parties (including a claim for retaliation) under any common law theory or any federal, state or local statute or ordinance not expressly referenced above; and any and all claims for counsel fees and cost.[15]

## C. Petitioners Sue Over The Separation Agreement, And medCPU Counterclaims.

On July 7, 2017, Petitioners sued medCPU in this Court, claiming medCPU breached the Separation Agreements by repudiating its obligation to make payments.[16] medCPU answered and asserted affirmative defenses and counterclaims, stating it ceased making payments under the Separation Agreements because Petitioners breached the Loyalty and Separation Agreements first.[17] According to medCPU, Petitioners formed non-party Health Precision, Inc. on

---

[15] *Id.* § 3(a).

[16] *Ephrat v. medCPU, Inc.*, C.A. No. 2017-0493-MTZ (the "Merits Action"), D.I. 1.

[17] Merits Action, D.I. 4.

7

December 30, 2016, and Health Precision is competing or will compete with medCPU.[18] Ephrat is Health Precision's Chief Executive Officer and Ben-Yehuda is its President.[19] Petitioners contacted medCPU clients or potential clients and marketed their competitive product.[20] medCPU alleged Petitioners supported these competitive activities by misappropriating information from the Company, including by continuing to use their medCPU email accounts,[21] and improperly contacting medCPU employees.[22]

The Company brought six counterclaims. Count I asserts Petitioners breached their Loyalty Agreements by soliciting a medCPU client after the Separation Date,[23] working for a competitor after the Separation Date,[24] retaining medCPU emails Petitioners obtained after leaving medCPU,[25] and retaining medCPU Corporation Documents and Property.[26]

---

[18] *Id.* Countercl. ¶ 16.

[19] *Id.*

[20] *Id.* ¶¶ 17-18.

[21] *Id.* ¶¶ 20-29.

[22] *Id.* ¶¶ 30-33.

[23] *Id.* ¶ 41.

[24] *Id.* ¶¶ 42-43.

[25] *Id.* ¶¶ 44-45.

[26] *Id.* ¶¶ 46-47.

Count II asserts that these acts also breached the Separation Agreements. The Company claims Petitioners further breached the Separation Agreements by "contacting then-current employees of medCPU,"[27] and by "accessing and/or attempting to access medCPU's computer systems or electronic communication systems."[28]

Count III alleges that given their agreement not to engage in competitive activities for one year following the Separation Date, Petitioners breached the implied covenant of good faith and fair dealing by continuing to communicate with a medCPU client, receiving medCPU emails after their departure from medCPU, accessing medCPU's computer systems or electronic communication systems, and communicating with medCPU employees.[29]

In Count IV, medCPU seeks a declaration that because of Petitioners' breaches, it "is not obligated to provide any benefits or make any further payments to [Petitioners] under their Separation Agreements."[30] Count V asserts that Petitioners misappropriated and did not return medCPU Confidential Information, Corporation Documents and Property, and trade secrets "in their possession after

---

[27] *Id.* ¶¶ 61-62.

[28] *Id.* ¶¶ 63-64.

[29] *Id.* ¶¶ 72-79.

[30] *Id.* ¶¶ 102-03.

9

separation from employment with medCPU."[31]  And Count VI asserts an unjust enrichment claim for the separation payments medCPU made to Petitioners, as Petitioners supposedly experienced a significant benefit from misappropriating medCPU's information and breaching their obligations under the Loyalty and Separation Agreements.[32]

### D.    Petitioners Seek Advancement.

On November 21, 2018, Petitioners sued in this Court for advancement and indemnification under the Charter to cover their expenses in defending against medCPU's counterclaims in the Merits Action.  The parties cross-moved for summary judgment, and I heard argument on March 21, 2019.

## II.    ANALYSIS

On their cross-motions for summary judgment, the parties have not argued that there are any issues of fact material to the disposition of either motion. Under Court of Chancery Rule 56(h), the cross-motions therefore became "the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[33]  The Court will thus decide the cross-motions as a matter of law based on that record.

---

[31] *Id.* ¶ 105.

[32] *Id.* ¶ 112.

[33] Ct. Ch. R. 56(h).

**A.**     **A Portion Of The Counterclaims Are Asserted Against Petitioners "By Reason Of The Fact" Of Their Services As Officers And Directors.**

"Section 145(e) of the [DGCL] confers permissive authority on Delaware corporations to grant advancements."[34]  Article SEVENTH of the Charter provides advancement rights "to the fullest extent permitted by the provisions of Section 145 of the DGCL."[35]  Under that language, the Charter's advancement right is coterminous with Section 145.[36]  The Company's advancement obligation therefore runs to "any and all persons whom it shall have power to indemnify and advance expenses to" under Section 145,[37] including officers, directors, employees, and agents.  It applies to actions taken in the covered capacity, "and shall continue as to a person who has ceased to be a director, officer, employee, or agent."[38]

The parties agree the Charter incorporates Section 145's "by reason of the fact" standard.  An advancement claim arises "by reason of the fact" of a person's corporate capacity "if there is a nexus or causal connection between any of the

---

[34] *Marino v. Patriot Rail Co.*, 131 A.3d 325, 332 (Del. Ch. 2016).

[35] D.I. 1 Ex. A art. SEVENTH.

[36] *Marino*, 131 A.3d at 332; *see also Reddy v. Elec. Data Sys. Corp.*, 2002 WL 1358761, at *3 (Del. Ch. June 18, 2002) ("the plain import of this provision is to require [the company] to advance funds to former employees like Reddy if § 145 of the DGCL would permit it to do so").

[37] D.I. 1 Ex. A art. SEVENTH.

[38] *Id.*

11

underlying proceedings contemplated by section 145(e) and one's official corporate capacity."[39] "The scope of an individual's advancement rights normally turns on the pleadings in the underlying litigation that trigger the advancement right."[40]

The parties focus on timing and capacity: they dispute whether acts Petitioners took after the Separation Date can support advancement. medCPU argues its counterclaims "arise exclusively out of Petitioners' misconduct *after* the Separation Date, all in breach of personal obligations they undertook in the Separation Agreement."[41] Petitioners find allegations underlying medCPU's counterclaims that discuss pre-separation conduct, and frame the counterclaims as based on Petitioners' use of information and contacts they obtained only by reason of the fact of their service to medCPU. This Court has provided several decisions analyzing advancement for a former fiduciary who allegedly used information learned in an official capacity after leaving the company. I review them in chronological order.

The first is *Brown v. LiveOps, Inc.*, issued on the defendant corporation's motion to dismiss.[42] The corporation had sued a former officer and director for

---

[39] *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 214 (Del. 2005).

[40] *Marino*, 131 A.3d at 346.

[41] D.I. 19 at 17-18.

[42] 903 A.2d 324 (Del. Ch. 2006). Taken to its nascence, this line of cases includes *Merritt-Chapman & Scott Corp. v. Wolfson*, 321 A.2d 138 (Del. Super. Ct. 1974) and *Perconti v. Thornton Oil Corp.*, 2002 WL 982419 (Del. Ch. May 3, 2002). Those decisions

violating "its contractual and intellectual property rights by operating a competing business" formed after the individual left the corporation.[43]  The corporation's claims included copyright infringement, unfair competition, misappropriation of trade secrets, conversion, and breach of a termination agreement.[44]  The corporation initially argued that many of those acts occurred before the individual left his position, but later removed the pre-departure conduct from its claims.[45]  Doing so allowed the corporation to argue "that the claims asserted against [the petitioner] concern his personal misconduct *after* his termination as a director and officer of the company."[46]  The petitioner responded that "he would not have had access to the confidential and proprietary information alleged to have been misappropriated had he not been a corporate officer."[47]

"After careful review of the underlying complaint," this Court sided with the petitioner because it was "clear that the claims alleged [] are inextricably intertwined

---

established that individuals who had access to non-public corporate information had it by reason of the fact of their official capacities.  The individuals in those cases traded for their own benefit while still at the company, so the courts did not address the question presented here concerning using the information after leaving the company.

[43] *LiveOps*, 902 A.2d at 325.

[44] *Id.*

[45] *Id.* at 326.

[46] *Id.* at 327 (emphasis in original).

[47] *Id.*

with his position as an officer and director of the company."[48] "[T]he copyright infringement and the misappropriation of trade secrets claims allege[d] that [the petitioner] gained access to the company's source codes while he was a corporate official at the company"[49] and that the petitioner had "wrongly retained and copied the proprietary information while he was" still at the corporation.[50] Because "[t]he gravamen of the underlying complaint [was] that [the petitioner] had access to proprietary information by reason of the fact that he was a director and officer [] and that he wrongly used that information for his personal benefit," this Court denied the motion to dismiss the petitioner's advancement claim.[51]

The next case is *Zaman v. Amedeo Holdings, Inc.*, in which the petitioners sought advancement to defend themselves against breach of fiduciary duty and breach of contract claims.[52] The underlying complaint alleged the petitioners "breached their obligation to keep confidential certain information they acquired while" serving as fiduciaries, disclosed the information to adversaries, and refused to return the information.[53] "Although this allegation ar[ose] in part out of conduct

---

[48] *Id*. at 328.

[49] *Id*.

[50] *Id*. at 329.

[51] *Id*. at 330.

[52] 2008 WL 2168397 (Del. Ch. May 23, 2008).

[53] *Id*. at *30.

14

that took place after the" petitioners were removed from their positions as officers and directors, the Court concluded they were still entitled to advancement because the claims alleged that they "as fiduciaries, had access to confidential information and breached their fiduciary duty by disclosing it to third parties and by misappropriating it for themselves."[54] According to then-Vice Chancellor Strine, that created "the necessary nexus between their official capacity and the claims" to satisfy the "by reason of the fact" standard.[55]

In *Pontone v. Milso Industries Corp.*, "[t]he central allegation [was] that [the petitioner (a former officer and director) and others] engaged in a wrongful scheme to induce several [] employees and many of their most lucrative customers to move" to a new company.[56] They allegedly did so with "highly proprietary confidential information and trade secrets" they obtained from their "continuous and unrestricted access" they enjoyed from their positions.[57] The defendants moved to dismiss the claim for advancement, and lost. Vice Chancellor Parsons summarized previous

---

[54] *Id*. at *31.

[55] *Id*.

[56] 100 A.3d 1023, 1030 (Del. Ch. 2014). Master LeGrow's Final Report in *Rizk v. TractManager, Inc.*, C.A. No. 9073-ML (Del. Ch. May 30, 2014) was issued before *Pontone*. Though the losing side took exceptions, the case settled before a decision on the exceptions. In short, *Rizk* applied *LiveOps*: "Although the alleged wrongful retention of the equipment and data did not occur until after the Plaintiffs were terminated from TMI, the claims bear a causal connection to the Plaintiffs' official capacity, because it was in that capacity that they had access to the equipment and data." *Id*. at 21.

[57] *Pontone*, 100 A.3d at 1051.

15

decisions and noted, "[t]his Court has held previously that where the claims asserted against a defendant in an action are based on the misuse of confidential information that the defendant learned in his or her official corporate capacity, that action qualifies as being asserted 'by reason of' that corporate capacity."[58] He concluded the allegations were "based largely on [a] misuse and misappropriation of confidential and proprietary information that he learned in his capacity as an officer or director," which was "sufficient to support the conclusion that [the petitioner] was made a party to the [the case] 'by reason of' his former role as [an] officer or director, even in the absence of a claim against him for breach of fiduciary duty."[59]

The next decision arrived at a different conclusion. In *Lieberman v. Electrolytic Ozone, Inc.*,[60] the underlying proceeding involved claims against one former officer and director, and one former officer. The company alleged those two individuals breached a "Proprietary Information, Invention Assignment and Non–Solicit and Non–Compete Agreement" because they failed "to return [defendant's] property and proprietary information" and did not "comply with post-termination obligations[.]"[61] Those obligations included destroying or delivering

---

[58] *Id*. at 1052.

[59] *Id*. at 1052-53.

[60] 2015 WL 5135460 (Del. Ch. Aug. 31, 2015).

[61] *Id*. at *1.

information, returning company property, and not working for a competitor for one year after the end of their employment.[62] The petitioners argued the claims against them were "based on the alleged misuse of confidential information that the Plaintiffs learned as officers and employees."[63] Because they only had the confidential information because of their roles at the company, the underlying contractual claims were grounded in an "alleged misuse of the substantial fiduciary responsibility that they were given in their capacities as employees, officers and/or directors."[64]

The Court rejected that analysis, concluding that the misuse stemmed from "post-termination conduct" and "personal contractual relationships."[65] It reiterated the point in noting that "[defendant]'s contractual claims are not dependent on any alleged on-the-job misconduct. Rather, each claim is derived from specific contractual obligations, which Plaintiffs allegedly breached post-termination."[66] The Court went on: "This is not an instance where conduct inappropriate during employment continued in some fashion after termination. The dispute is over what Plaintiffs did post-employment with information they properly and apparently

---

[62] *Id*. at *4-5.

[63] *Id.* at *5.

[64] *Id.* at *5.

[65] *Id*. at *4-5.

[66] *Id*. at *4.

17

necessarily learned while employed. The bases for the claims are in the [Proprietary] Agreements."[67] The Court distinguished *LiveOps* because the claims before it were "confined to post-termination actions that [did] not depend on [the] use of corporate authority or position" and the conduct as "officers, directors, or employees [was] essentially immaterial" to the "contractually-based" claims.[68]

Finally, in *Thompson v. Orix USA Corp.*,[69] the Court granted advancement to a former officer, and a former officer and director. One of the individuals "had begun planning his next career move" and formed an entity shortly before resigning.[70] The petitioners argued the underlying action was by reason of their former positions with the company because the company had alleged "that they misappropriated confidential information to which they had access because of their positions."[71] Because it was "far from clear how much, if any, of the conduct at issue took place after plaintiffs' disaffiliation," "[r]ather than engage in a line-drawing exercise," Chancellor Bouchard believed it more appropriate "for counsel

---

[67] *Id.* at *6 n.43.

[68] *Id.* at *5-6.

[69] 2016 WL 3226933 (Del. Ch. June 3, 2016).

[70] *Id.* at *1.

[71] *Id.* at *4.

to monitor the expenses for which advancement is requested and address granular disputes as necessary at the indemnification stage."[72]

In conducting this review, I found it difficult to harmonize *Lieberman* with the other decisions. medCPU understandably offers *Lieberman* as the case that dictates the outcome here, while Petitioners prefer *LiveOps*, *Pontone*, and *Thompson*. I follow the weight of authority under *LiveOps*, *Pontone*, and *Thompson*, and conclude that medCPU's allegations relating to post-separation use of confidential information learned pre-separation are "by reason of the fact" of Petitioners' positions. "Determining whether and to what degree [Petitioners are] entitled to advancements requires applying the preceding framework to the Underlying Action."[73]

### i. Counts I, II, III, and V

Counts I, II, and III assert Petitioners' post-separation conduct breached their Loyalty Agreements, Separation Agreements, and the implied covenant of good faith and fair dealing, respectively. "Claims brought by a corporation against an [individual] for . . . breaches of a non-competition agreement are 'quintessential examples of a dispute between an employer . . . and an employee' and are not brought

---

[72] *Id*. at *6.

[73] *Marino*, 131 A.3d at 346.

'by reason of the fact' of the director's position with the corporation."[74]  Petitioners agreed to personal restrictions in the Loyalty and Separation Agreements.  The allegations that Petitioners violated those restrictions are not, without more, "by reason of the fact" of their corporate positions.  But under the *LiveOps* line of cases, where Petitioners allegedly used confidential information they obtained by reason of the fact of their service to medCPU in breaching their personal agreements, advancement is warranted.

Breaches that warrant advancement relate to retaining and failing to return medCPU emails,[75] possessing and failing to return medCPU Corporation Documents and Property (including on a DropBox account that existed before Petitioners left the Company),[76] and "possessing, using and/or misappropriating medCPU's confidential and proprietary information."[77]

Advancement is also warranted for Count V, a more focused count which alleges misappropriation of confidential information and trade secrets.  medCPU

---

[74] *Weaver v. ZeniMax Media, Inc.*, 2004 WL 243163, at *3 (Del. Ch. Jan. 30, 2004) (quoting *Cochran v. Stifel Fin. Corp.*, 2000 WL 1847676, at *7 (Del. Ch. Dec. 13, 2000)); *see also Cochran*, 2000 WL 1847676, at *7 (ruling "Non-Compete Claims were not brought against [the individual] 'by reason of the fact' that he was serving in indemnification-eligible positions . . . but 'by reason of the fact' that he had allegedly breached a personal contractual obligation he owed").

[75] Merits Action, D.I. 4 Countercl. ¶¶ 44-45, 57-58.

[76] *E.g.*, *id.* ¶¶ 35, 46-47, 59-60.

[77] *Id.* ¶ 49.

20

alleges that "[d]uring their employment with medCPU, [Petitioners] had access to, acquired, and used certain of medCPU's confidential information and trade secrets."[78] This information is allegedly still "in their possession after [their] separation from employment with medCPU," constituting a misappropriation of the information.[79] And Petitioners' "use and disclosure of such information . . . constitute an unauthorized disclosure or use of medCPU's trade secrets."[80] Petitioners are entitled to advancement for this count.

Other alleged breaches of Petitioners' personal agreements do not warrant advancement because they do not rely on allegations that Petitioners misused or misappropriated information they learned by reason of the fact of their service to medCPU, and allege no other nexus or causal connection to that service. These allegations relate to competitive activities, including working for and soliciting customers on behalf of a company "engaging in activities competitive with the activities of medCPU,"[81] contacting medCPU employees,[82] and accessing medCPU's computer or electronic communications systems.[83] As alleged,

---

[78] *Id.* ¶ 105.

[79] *Id.*

[80] *Id.* ¶ 108.

[81] *E.g.*, *id.* ¶¶ 40-42, 54-56, 72.

[82] *E.g.*, *id.* ¶¶ 61-62, 76-77.

[83] *E.g.*, *id.* ¶¶ 63-64, 94-95. Where that access facilitated Petitioners' use of medCPU confidential information that existed prior to the Separation Date, advancement is

Petitioners took these actions after they left medCPU, and did not use confidential information Petitioners obtained by reason of the fact of their positions with medCPU in doing so. The Company did not allege any nexus or causal connection between these actions and Petitioners' former corporate roles at medCPU. These alleged breaches do not warrant advancement.

### ii. Counts IV and VI

Count IV seeks a declaratory judgment that the Petitioners' conduct frees the Company from their obligations "to provide any benefits or make any further payments" under the Separation Agreements.[84] It alleges the same breaches of the Loyalty and Separation Agreements and implied covenant based on soliciting medCPU clients and employees, working for a medCPU competitor,[85] and misusing and failing to return medCPU information.[86] Count VI alleges unjust enrichment on the theory that the alleged "misappropriation and breach of obligations under each of the Loyalty Agreements and Separation Agreements has conferred a significant benefit on Counterclaim Defendants."[87]

---

warranted under the first category. *See id.* ¶¶ 23, 28. But mere access to medCPU's email system, without more, has no nexus to Petitioners' service as an officer or director.

[84] *Id.* ¶¶ 102-03.

[85] *Id.* ¶¶ 85-87, 92-93, 96, 100-101.

[86] *Id.* ¶¶ 88-91, 94-95, 97-98.

[87] *Id.* ¶ 112.

These Counts depend on the same factual allegations as the counterclaims discussed above. Advancement is similarly awarded only where the underlying acts depended on or utilized confidential information Petitioners obtained by reason of their service at medCPU.

**B.      Petitioners Did Not Release Their Advancement Rights.**

medCPU argues that even if Petitioners qualify for advancement, they released their claims in the Separation Agreements.[88] The parties agree New York law applies.[89] "Generally, a valid release constitutes a complete bar to an action on a claim which is the subject of the release. If the language of a release is clear and unambiguous, the signing of a release is a 'jural act' binding on the parties."[90] "No particular [form] of words is required to make a written release effective; all that is necessary is that the words show an intention to discharge. The scope and meaning

---

[88] Petitioners assert medCPU waived this defense, as medCPU did not plead an affirmative defense of release as required under Court of Chancery Rule 8(c). The Separation Agreements are the foundation of both Petitioners' claims and medCPU's counterclaims in the underlying case. And Petitioners mention the Agreements more than twenty times in their Petition for Advancement and Indemnification. The contractual release was thus sufficiently incorporated into the pleadings and in the record that waiver is not warranted. *See Seven Invs., LLC v. AD Capital, LLC*, 32 A.3d 391, 396 (Del. Ch. 2011) (considering release that was not pled as affirmative defense "because the Complaint incorporate[d] the Termination Agreement by reference"); *James v. Glazer*, 570 A.2d 1150, 1154 (Del. 1990) (describing "exception to the general rule, that affirmative defenses are waived if not pled . . . when evidence of an unpled affirmative defense is admitted without objection").

[89] D.I. 20 Ex. B & C § 14.

[90] *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011) (internal citations and quotation marks omitted).

of a release will be determined by the manifested intent of the parties,"[91] and "the context of the controversy being settled."[92]

The Separation Agreements "supersede[d] all prior agreements, arrangements and understandings, written or oral, between the parties with respect to the subject matter herein[.]"[93] According to medCPU, Petitioners' right to advancement must be reiterated in the Separation Agreements or carved out from the release. Neither being true under medCPU's reading of the Separation Agreements, medCPU concludes Petitioners waived their advancement rights.

The release in section 3(a) of the Separation Agreements only covers Petitioners' rights as employees. The release encompasses claims "relating to or arising out of Executive's *employment* with the Company Released Parties or the termination thereof."[94] Petitioners contrast this language against medCPU's release of claims against Petitioners in Section 3(b), which includes "any claims in any way related to Executive's employment with the Company *or his/her acts or omissions as a director or officer of the Company*."[95] Petitioners point to Section 3(b)'s additional language referencing acts as a Company director or officer, absent from

---

[91] *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir. 1965).

[92] *In re Schaefer*, 221 N.E.2d 538, 540 (N.Y. 1966).

[93] D.I. 20 Ex. B & C § 16.

[94] D.I. 20 Exs. B & C § 3(a) (emphasis added).

[95] *Id*. § 3(b) (emphasis added).

Section 3(a), and conclude they did not release claims stemming from their status as directors or officers, including their advancement rights.[96]

Petitioners' argument is bolstered by the enumerated released claims. These include, without limitation, claims arising under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act. The enumerated list is followed by more general types of claims: "any other federal, state or local statutory laws relating to employment, discrimination in employment, termination of employment, wages, benefits or otherwise; or any other federal, state or local constitution, statute, rule, or regulation, . . . addressing fair employment practices."[97] These laws govern claims that any employee could potentially assert related to her employment or the termination of her employment. They are narrowly described, and do not include sources of advancement. And under the canon of *ejusdem generis*, I read the general categories

---

[96] The parties did not focus on how the Separation Agreements defined employment. The second WHEREAS clause and section 1 imply that the scope of employment included Petitioners' roles as officers, but not directors. Including work as an officer in employment, but not work as a director, would lead to the untenable result of advancement for acts taken as a director, but not as an officer. Absent clearer language that the parties intended this unusual division, I decline to read the Separation Agreement this way.

[97] D.I. 20 Exs. B & C § 3(a).

in light of the preceding specific employment laws.[98]   Nothing in this provision shows an intent to release advancement claims.

In sum, Section 3(a) releases rights within the contractual employee-employer relationship, and not the advancement and indemnification rights the Charter provides to Petitioners in their roles as officers, directors, employees, and agents. This conclusion is supported by Section 3(b), in which the parties addressed the officer and director relationship.  Yet they did not do so in Section 3(a).[99]   In view of Section 3(b), Section 3(a) has only one reasonable reading:  the release covers Petitioners' claims as employees, but not as an officer or director.[100]

---

[98] "The well-established rule of construction, *ejusdem generis*, is that 'where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.'"  *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 (Del. 2004) (quoting *Petition of State*, 708 A.2d 983, 988 (Del. 1998)).

[99] medCPU also highlights Section 3(a)'s reference to "any and all claims for counsel fees and costs" and contends that a claim for advancement and indemnification is a claim for counsel fees and costs, and so was released.  Under the plain meaning of the provision, "claims for counsel fees and costs" refers to those incurred in any dispute subject to the release.  Advancement and indemnification are significant independent rights, not merely claims for fees.

[100] Petitioners' release contains an additional temporal limitation.  Petitioners only released rights "based upon or arising out of any facts, acts, conduct, omissions, transactions, occurrences, contracts, claims, events, causes, matters or things of any conceivable kind or character existing or occurring or claimed to exist or to have occurred prior to the date of the Executive's execution of this Agreement."  Petitioners only released claims for actions they took before executing the Separation Agreement.

26

Finally, medCPU argues the parties agreed in Section 6 of the Separation Agreement to limited indemnification only on a going-forward basis, and only for third-party claims. medCPU reads the provision as displacing previous advancement and indemnification rights. I read the provision differently: Section 6 provides Petitioners with indemnification protections against all third-party suits, regardless of whether they were brought by reason of the fact of their fiduciary service, in addition to the advancement rights they already enjoyed under medCPU's Charter.

## C. Petitioners Are Entitled To Fees on Fees.

When parties seeking advancement achieve only limited success, their award of fees must reflect their limited success.[101] Petitioners are thus entitled to receive some fees on fees.

"[T]he determination of the level of success is a nonscientific inquiry that simply involves a reasoned consideration of the issues at stake in the case and an assessment of the plaintiffs' level of success."[102] Here, the two key issues were whether the counterclaims were "by reason of the fact" of Petitioners' service as

---

[101] *See Zaman*, 2008 WL 2168397, at *39 ("this court has held that plaintiffs who are only partially successful shall receive fees on fees reflecting the extent of their success"); *see also Thompson*, 2016 WL 3226933, at *7 (awarding fees on fees only for part of suit party prevailed on and not issues on which the court reserved decision).

[102] *Zaman*, 2008 WL 2168397, at *39.

officers, directors, employees, and agents, and whether Petitioners released their claims. Petitioners prevailed on half of the first issue relating to the use of confidential information, and all of the second issue as I concluded they did not release their advancement rights. I therefore award Petitioners 75% of their fees incurred in pursuing this action.[103]

## III. CONCLUSION

Partial summary judgment is entered for the Petitioners. The parties shall submit a stipulated form of order within ten days of this opinion imposing the framework detailed by this Court in *Danenberg v. Fitracks, Inc.,*[104] which order shall govern the submission of further requests for advancement and the prompt resolution of any disputes that arise regarding such requests.

**IT IS SO ORDERED.**

---

[103] *See Pontone*, 100 A.3d at 1058 (awarding 75% of fees where petitioner prevailed on right to advancement for future expenses, but not previously incurred fees); *Zaman*, 2008 WL 2168397, at *39 ("An award of 80% of the [] fees is a measured way to reflect" the policy interest of ensuring costs of prosecution do not offset vindication of advancement rights "while giving the defendants credit for the fact that the [petitioners] did not attain complete success.").

[104] 58 A.3d 991, 1003-04 (Del. Ch. 2012).