**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

PAUL A. FIORAVANTI, JR.
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

June 17, 2026

Seth A. Niederman, Esquire
Fox Rothschild LLP
1201 N. Market Street, Suite 1200
Wilmington, DE 19801

Kevin J. Mangan, Esquire
Zachary Murphy, Esquire
Womble Bond Dickinson (US) LLP
1313 N. Market Street, Suite 1200
Wilmington, DE 19801

Richard M. Beck, Esquire
Sally E. Veghte, Esquire
Caixia Su, Esquire
Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801

> RE:  *Gower v. Trux, Inc. et al.*,
>       C.A. No. 2020-0996-PAF

Dear Counsel:

This letter decision resolves the pending cross-motions for summary judgment

of defendants Trux, Inc. ("Trux" or the "Company") and Viking Venture Partners,

LLC ("Viking"), and intervenor Richard Saccone.[1]

---

[1] Citations to the docket in this action are in the form of "Dkt. [#]." Because multiple parties in this case share the surname "Saccone," this letter decision refers to them by their first names after initially identifying each individual by their full names. No familiarity or disrespect is intended. Unless otherwise defined herein, exhibits submitted with Richard Saccone's Affidavit in Support of His Motion for Summary Judgment (Dkt. 172) are cited as "Ex. __," and citations to the paragraphs within his affidavit are cited as "Richard's Aff. ¶ __." Richard Saccone's Amended Cross-Claims in Intervention is cited as "Cross-

## I.  BACKGROUND

In April 2020, Viking acquired a majority of the outstanding stock of Trux from Michael Saccone, Sr., Michael Saccone, Jr., Michael Whouley (collectively, the "Selling Stockholders"), and Richard (the "Transaction").  Shortly thereafter, another Trux stockholder, Jeffrey Gower, initiated this action with a complaint alleging that Trux, Viking, and the Selling Stockholders breached a right of first refusal and co-sale agreement governing transfers of Trux stock (the "ROFR Agreement").[2]  In June 2021, Richard intervened in the action and filed a counterclaim seeking a declaratory judgment that the Transaction was void under the express terms of the ROFR Agreement.[3]

In March 2023, the court entered a stipulated order of dismissal with prejudice as to Gower's claims.[4]  Even though Richard stipulated to that dismissal, in October 2023 he filed an amended answer and cross-claims for declaratory judgment and

---

Claims ¶ __," and Richard Saccone's Amended Answer is cited as "Richard's Answer ¶ __." Dkt. 143.  Unless otherwise indicated, citations to the parties' briefs are to summary judgment briefs.

[2] Dkt. 1; Ex. 2 (hereinafter the "ROFR Agreement").  The ROFR Agreement is governed by Delaware law.  *Id*. § 6.11.

[3] Dkts. 31, 34, 39.

[4] Dkt. 126.

breach of contract (the "Cross-Claims").[5]  Viking and Trux have each moved for summary judgment, arguing that the ROFR Agreement was not breached and that, even if it had been breached, Richard released his claims when he executed the stock purchase agreement documenting his sale of Trux stock to Viking.[6]

### A.     The Parties

Trux is a privately held Delaware corporation that offers technology designed to facilitate trucking services in the construction industry.[7]  Trux is authorized to issue Common and Preferred Stock.[8]  At the time of the challenged transaction, there was Common Stock and Series A Preferred Stock issued and outstanding.

Richard founded Trux in 2015 and served as its president, chief executive officer, and a member of its board of directors (the "Board") until early 2018.[9] Richard owned approximately 18.55% of Trux's then-outstanding stock on a fully diluted basis prior to the Transaction.[10]

---

[5] Dkts. 143, 172.

[6] Dkts. 206–10.

[7] Dkt. 159 ("Trux's Answer") ¶¶ 11, 14.

[8] *See* Ex. 1 (hereinafter the "Amended Certificate") at 1–2.

[9] Cross-Claims ¶ 9; Richard's Aff. ¶¶ 2, 6; Trux's Answer ¶ 9.

[10] Cross-Claims ¶ 15; Dkt. 158 ("Viking's Answer") ¶ 15.

Viking is a Delaware limited liability company and a wholly owned subsidiary of Vulcan Materials Company, LLC, one of Trux's largest customers.[11] Viking owned approximately 28.7% of Trux's outstanding stock on a fully diluted basis prior to the Transaction.[12]

The Selling Stockholders collectively owned approximately 33% of Trux's outstanding stock on a fully diluted basis prior to selling their shares to Viking in the Transaction.[13]

## B. The 2018 Viking Investment and Governing Documents

In April 2018, Viking acquired 5,338,420 shares of Series A Preferred Stock, representing approximately 20% of Trux's outstanding stock on an as-converted basis.[14] Concurrent with that transaction, Trux adopted the Amended and Restated Certificate of Incorporation (the "Amended Certificate"), and Trux, its stockholders, including Viking and Richard, entered into the ROFR Agreement.[15]

---

[11] Richard's Answer ¶ 10; Cross-Claims ¶ 10; *see* Viking's Answer ¶ 10.

[12] Viking's Answer ¶ 16; Trux's Answer ¶ 16.

[13] *See* Richard's Answer ¶¶ 11–13.

[14] Richard's Aff. ¶ 5; Viking's Answer ¶ 17; Trux's Answer ¶ 17. As part of the 2018 transaction, Richard sold 2,323,521 shares of common stock to Viking and agreed to resign as a director and, later, as president. Richard's Aff. ¶ 5; Viking's Answer ¶ 18.

[15] Amended Certificate at 1; *see* Richard's Aff. ¶ 7; Trux's Answer ¶¶ 19, 22; Viking's Answer ¶¶ 19, 22.

The Amended Certificate defines certain events that constitute a "Deemed Liquidation Event," including "the sale, transfer or other disposition, in a single transaction or series of related transactions, by the stockholders of the [Company] of a majority of the outstanding shares of capital stock of the [Company] (determined on an as-converted Common Stock basis)."[16]  This provision features prominently in the Cross-Claims and the parties' cross-motions for summary judgment.

## C.     The ROFR Agreement

The ROFR Agreement governs three subjects that are pertinent here:  how Trux stockholders may transfer shares, the circumstances under which rights of first refusal and co-sale apply, and the transfers that are exempt from those procedures. The ROFR Agreement distinguishes between "Investors" and "Stockholders."[17] Viking is identified as one of four Investors and is defined individually as the "Viking Investor,"[18] possessing distinct priority rights.  Viking also held Capital Stock and therefore came within the agreement's definition of "Stockholder."

---

[16] Amended Certificate § 2.3.1(c).

[17] ROFR Agreement § 1.11 (defining "Investors" as "the persons named on Schedule A [of the ROFR Agreement]"); *id.* § 1.23 (defining "Stockholder" as "any holder of Capital Stock of the Company").  The definition of "Capital Stock" includes all Common Stock and Series A Preferred Stock, plus any Common Stock issuable upon conversion of the Series A or other convertible securities.  *Id.* § 1.3.

[18] *Id.* Sched. A & § 1.28.

Richard, the Selling Stockholders, and Gower are also among those identified as Stockholders.[19]

### 1.     The ordinary transfer process

Sections 2.1 through 2.3 establish the ordinary process for a Stockholder-initiated transfer of Trux stock.  Section 2.1(b) applies when a Stockholder proposes to make a "Proposed Transfer."  It requires the proposing Stockholder to deliver a Proposed Transfer Notice to the Company, Viking, the other Investors, and each Closing Stockholder at least 60 days before the Proposed Transfer.[20]  The Selling Stockholders, Richard, and Gower qualified as Closing Stockholders.[21]

A "Proposed Transfer" is defined as any "assignment, sale, offer to sell, pledge, mortgage, hypothecation, encumbrance, disposition of or any other like transfer or encumbering of any Transfer Stock (or any interest therein) proposed by any Stockholder."[22]  Transfer Stock encompasses both Common Stock and Series A Preferred Stock.[23]  The Proposed Transfer Notice "shall contain the material terms

---

[19] *Id.* Sched. B.

[20] *Id.* § 2.1(b).

[21] *Id.* § 1.4 (defining "Closing Stockholders" as the "holders of Common Stock as of [April 6, 2018]"); *id*. Sched. B (identifying the Selling Stockholders, Richard, and Gower as Stockholders as of April 6, 2018).

[22] *Id.* § 1.12.

[23] *Id.* §§ 1.3, 1.26.

and conditions (including price and form of consideration) of the Proposed Transfer, the identity of the Prospective Transferee, and the intended date of the Proposed Transfer."[24]

Once a Proposed Transfer Notice is delivered, the shares proceed through a waterfall of first-refusal rights. Under Section 2.1(a), Viking has a priority right to purchase the shares proposed to be transferred on the same terms offered to the Prospective Transferee, subject to a 49% aggregate ownership cap (the "Viking Ownership Threshold").[25] If any shares remain unpurchased after Viking exercises or declines that right, the other Investors have the next right of refusal.[26] If shares still remain, the Closing Stockholders have a further right of refusal.[27] If any shares remain unpurchased after those rights are exercised or waived, the Company may repurchase any of the offered shares.[28] If the Company does not purchase all

---

[24] *Id.* § 2.1(b). "Prospective Transferee" is defined as "any person to whom a Stockholder proposes to make a Proposed Transfer." *Id.* § 1.14.

[25] *Id.* § 2.1(a). The ownership threshold, defined as the "Viking Investor Ownership Threshold," conditioned Viking's exercise of its priority refusal right on Viking's post-exercise ownership not exceeding 49% of the Company on a fully diluted, as-converted basis. *Id.* §§ 1.29, 2.1(a). As discussed below, the ROFR Agreement was amended to remove the Viking Ownership Threshold in connection with the Transaction.

[26] *Id.* § 2.2(a).

[27] *Id.* § 2.2(c).

[28] *Id.* § 2.2(d).

remaining shares, Investors and Closing Stockholders that already exercised their rights of refusal may purchase any remaining shares on offer.[29]

Section 2.3 provides co-sale rights if, after completion of the right-of-first-refusal process, shares remain available for sale to the Prospective Transferee. In that circumstance, each Investor and Closing Stockholder may elect to participate in the sale by selling a pro rata portion of its own shares to the Prospective Transferee on the same terms and conditions as the original selling Stockholder.[30] The number of shares the original selling Stockholder may sell is reduced on a one-for-one basis for each share sold by the co-sale participants.[31] In the event that co-sale rights are exercised, Section 2.3(d) prescribes the allocation of consideration.[32]

### 2. The effect of noncompliance

Section 2.4 addresses the consequences of noncompliance with the ROFR Agreement's requirements that govern Proposed Transfers. This provision is the linchpin of Richard's Cross-Claims. A noncompliant Proposed Transfer is void and authorizes non-breaching parties to seek relief. Specifically, Section 2.4(a) states:

---

[29] *Id.* § 2.2(e).

[30] *Id.* § 2.3(a).

[31] *Id.* § 2.3(b).

[32] *See id.* § 2.3(d)(i)–(ii).

*Any Proposed Transfer not made in compliance with* the requirements of *this Agreement shall be null and void ab initio*, shall not be recorded on the books of the Company or its transfer agent and shall not be recognized by the Company. Each party hereto acknowledges and agrees that any breach of this Agreement would result in substantial harm to the other parties hereto for which monetary damages alone could not adequately compensate. Therefore, *the parties* hereto unconditionally and irrevocably *agree that any non-breaching party* hereto *shall be entitled to* seek protective orders, injunctive relief and other remedies available at law or in equity (including, without limitation, seeking specific performance or the *rescission of purchases*, *sales and other transfers of Transfer Stock not made in strict compliance with this Agreement*).[33]

### 3. Viking's protective rights in a potential Deemed Liquidation Event

Section 2.5 gives Viking protective rights in connection with a potential Deemed Liquidation Event. Those rights are triggered if "the Company desires to explore a potential Deemed Liquidation Event," or if the Company or a Stockholder "receives an unsolicited offer or indication of interest for a Deemed Liquidation Event."[34] In either scenario, the Company or Stockholder "shall promptly notify" Viking by providing a "Potential Sale Notice."[35]

After receiving a Potential Sale Notice, Viking may elect to pursue a purchase of the Company or its assets. If Viking wishes to do so, it must deliver a

---

[33] *Id.* § 2.4 (emphasis added).

[34] *Id.* § 2.5(a).

[35] *Id.*

"Negotiation Notice" to the Company within ten business days after receiving the Potential Sale Notice.[36]  The Negotiation Notice triggers an Exclusive Negotiation Period requiring the Company and Viking to negotiate in good faith for at least 60 days regarding a potential purchase by Viking at a commercially reasonable purchase price and on other commercially reasonable terms.[37]  During that Exclusive Negotiation Period, the Company may not solicit, entertain, discuss, negotiate, or consummate any Deemed Liquidation Event or sell equity interests or other rights in the Company to a third party.[38]  If Viking exercises its negotiation right, and the Company and Viking cannot agree on a "purchase price within the first seven days," they "shall obtain a third party valuation of the Company."[39]

Section 2.5 also provides Viking with matching rights if Viking does not exercise its initial negotiation rights and the Company later reaches terms with a third party for a potential Deemed Liquidation Event.[40]  In that circumstance, the Company must provide Viking with a second notice, and Viking has 30 days to

---

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.* § 2.5(b).

[40] *Id.* § 2.5(c).

acquire the Company on the same terms and conditions as the third-party offer.[41]

That matching right generally terminates after three years, but extends for an additional two years if the proposed third-party buyer is one of the Viking competitors listed in Section 1.22 of the ROFR Agreement.[42]

### 4. Exempted Transfers and Offerings

Section 3 is titled "Exempt Transfers."  Section 3.2 identifies two "Exempted Offerings."  In full, Section 3.2 states:

> Notwithstanding the foregoing or anything to the contrary herein, *the provisions of* <u>*Section 2*</u> *shall not apply to the sale of any Transfer Stock* (a) to the public in an offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (a "Public Offering"); or (b) *pursuant to a Deemed Liquidation Event* (as defined in the [Amended] Certificate).[43]

### D. Viking's 2020 Purchase of Trux's Outstanding Stock

Between February 26 and March 14, 2020, Viking delivered three proposals to Trux offering to purchase "all the outstanding shares [] of [Trux] capital stock

---

[41] *Id.*

[42] *Id.* §§ 1.22, 2.5(c)–(d).  Viking's rights under Subsection 2.5 terminate "in the event a Deemed Liquidation Event occurs with respect to the Viking Investor."  *Id.* § 2.5(f).

[43] *Id.* § 3.2 (emphasis added).  The ROFR Agreement "shall automatically terminate upon . . . the consummation of a Deemed Liquidation Event."  *Id.* § 6.1(b).

held by all shareholders."[44]   The Trux Board rejected the first proposal,[45] but accepted the latter two proposals, delivered on March 12 and 14.  The Board asked stockholders to approve those proposals via written consents.[46]   Both written consents stated that the transaction would constitute a Deemed Liquidation Event under the Amended Certificate.[47]   The Selling Stockholders initially consented to the March 14 proposal.[48]  Richard did not execute either written consent.[49]

On March 27, Trux sent Richard a revised proposal it had received from Viking to purchase Trux's outstanding shares of capital stock.[50]   The March 27

---

[44] Exs. 3, 4, 6.

[45] Trux's Answer ¶ 36; Viking's Answer ¶ 36.

[46] Exs. 5 & 7; Richard's Aff. ¶¶ 10, 12; Cross-Claims ¶¶ 39–40, 44–45.

[47] Ex. 5 at 3 ¶ 3 ("The Transaction would constitute a Deemed Liquidation Event (as defined in the [Amended Certificate])."); Ex. 7 at 4 ¶ 3 (same).

[48] *See* Ex. 7 at 2.

[49] Cross-Claims ¶¶ 41, 46; Viking's Answer ¶¶ 41, 46.

[50] Ex. 8.  With the revised proposal, Trux sent Richard a revised written consent (the "Third Written Consent").  Ex. 9.  The Third Written Consent purported to authorize and ratify actions of the Company's officers and directors concerning the March 27 proposal and indicated that certain stockholders who had previously accepted the terms of the March 14 term sheet "hereby rescind their approval, if any, of the [p]rior [t]erm [s]heet." *Id.* at 1–2. The Third Written Consent did not indicate whether the proposed sales to Viking would constitute a Deemed Liquidation Event, but it did state that "Viking would acquire the issued and outstanding shares of the Company's capital stock." *Id.* at 1.  In his Cross-Claims, Richard alleges the Third Written Consent is invalid because the individual consents were not individually dated, and he was not provided prompt notice of action by

proposal provided stockholders with two options. Option A offered $1.18 per share—$0.52 at closing and a deferred payment of the balance within 15 months at Viking's discretion; Option B offered $0.92 per share at closing.[51] The accompanying term sheet stated that "Viking is prepared to purchase the Company" and that the "transaction will be structured as a purchase by Viking of the outstanding shares of capital stock."[52] The revised written consent sent with the proposal—the Third Written Consent—also stated that "Viking would acquire the issued and outstanding shares of the Company's capital stock."[53] The Selling Stockholders and Richard accepted the March 27 proposal.[54]

---

written consent. *See* Cross-Claims ¶ 87 (citing 8 *Del. C.* § 228(c), (e)). There are no allegations that stockholders possessing a majority of the Company's voting power executed the consent or that it was necessary to effectuate the Transaction. Richard does not allege to have executed the Third Written Consent. In any event, Richard did not brief these issues. Consequently, they are waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."); *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *20 (Del. Ch. Mar. 28, 2018) ("Issues not properly briefed are deemed waived.").

[51] Ex. 8 at 2.

[52] *Id.*

[53] Ex. 9 at 1.

[54] Richard's Aff. ¶ 16; Cross-Claims ¶ 48; *see* Viking's Answer ¶ 48; *see also* Richard's Opening Br. 10.

### 1. The ROFR Amendment

On March 31, the Selling Stockholders, together with Trux and Viking, executed an amendment to the ROFR Agreement in connection with Viking's March 27 offer (the "ROFR Amendment").[55] The ROFR Amendment removed the Viking Ownership Threshold in Section 2.1(a), but left Viking's priority right of first refusal unchanged.[56] It also waived the procedures governing the Investors' ability to exercise their rights of first refusal under Section 2.2(b).[57] Important here, the ROFR Amendment waived the Closing Stockholders' (including Richard's) rights of refusal and repurchase under Section 2.2(c), the Company's repurchase right

---

[55] Ex. 10; Richard's Aff. ¶ 17; Cross-Claims ¶ 88; *see also* Richard's Opening Br. 11–12. The ROFR Agreement may be amended or waived through a written instrument executed by the Company, Viking, and holders of a majority of the Company's Capital Stock, which is binding on all Stockholders. ROFR Agreement § 6.8. The Board approved the ROFR Amendment by unanimous written consent on April 1. Ex. 12. Richard has not challenged the ROFR Amendment.

[56] *Compare* ROFR Agreement §§ 1.29, 2.1(a), *with* Ex. 10 ¶¶ 1–2.

[57] Ex. 10 ¶ 2; *see* ROFR Agreement § 2.2(b) ("*To exercise its, his or her Right of First Refusal, an Investor must deliver an Investor Notice to the selling Stockholder*, the other Closing Stockholders and the Company within fifteen (15) days after delivery of the Proposed Transfer Notice specifying the number of shares of Remaining Transfer Stock to be purchased by the Company.") (emphasis added).

under Section 2.2(d), and the residual purchase rights under Section 2.2(e), as well as the closing mechanics in Section 2.2(f).[58]

### 2.    The Stock Purchase Agreements

On April 1, the Selling Stockholders each executed stock purchase agreements to sell their shares to Viking.[59]  On April 7, Richard executed his stock purchase agreement (the "Stock Purchase Agreement"), accepting Option A, which provided for payment of $5,843,180.64 for his shares.[60]  The Stock Purchase Agreement is governed by Delaware law.[61]  Collectively, the Transaction resulted in stockholders selling over 53% of Trux stock to Viking, increasing Viking's ownership to over 80%.[62]

The stock purchase agreements contained mutual releases.  Pertinent here, Richard released Trux and Viking from all claims "based on acts, events or omissions occurring on or prior to [the Stock Purchase] Agreement and relating to [Richard's] ownership of [Trux shares] or the services by [Richard]. . . as a director,

---

[58] Ex. 10 ¶ 3.

[59] Richard's Aff. ¶ 18.

[60] Ex. 13; Richard's Aff. ¶ 20.  Unlike the Selling Stockholders and Richard, Gower did not execute a similar agreement.

[61] Ex. 13 § 8.

[62] Richard's Aff. ¶ 20; Ex. 11 at 2; Cross-Claims ¶¶ 11, 73; *see* Viking's Answer ¶ 73; Trux's Answer ¶ 73.

officer, employee . . . or board observer of [Trux]" (the "Seller's Release").[63] In return, Viking and Trux released Richard from all claims "relating to [Richard's] ownership of the [s]hares or the services . . . as a director, officer, employee . . . of [Trux]."[64] The Stock Purchase Agreement also contains a severability provision.[65]

## II. ANALYSIS

Richard seeks an order declaring that: (1) his and the Selling Stockholders' sales of their Trux shares to Viking are void for failure to comply with the strict terms of the ROFR Agreement; (2) he and all Trux stockholders who agreed to sell their shares to Viking are restored to their prior ownership positions; and (3) all stock transactions post-dating the breaches of the ROFR Agreement are void and must be rescinded.[66] Viking and Trux seek summary judgment on the grounds that they did

---

[63] Ex. 13 § 10.

[64] *Id.* § 11.

[65] *Id.* § 15 ("Should any part of this Agreement . . . be declared invalid, illegal, or incapable of being enforced in whole or in part, such decision shall not affect the validity of any remaining portion, which . . . shall remain in full force and effect as if this Agreement had been executed with the invalid portion [] eliminated.").

[66] Cross-Claims ¶¶ 8, 99–100. On August 28, 2024, Richard filed another action in this court, *Saccone v. Charnley*, C.A. No. 2024-0901-PAF (Del. Ch.). The *Charnley* action alleges that Viking and Charnley breached the ROFR Agreement when Viking acquired Charnley's stock in Trux in July 2024. That action has been stayed pending resolution of this action.

not breach the ROFR Agreement and that Richard released his claims when he executed the Stock Purchase Agreement that contained the Seller's Release.

## A. Standard of Review

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Ct. Ch. R. 56(a).[67] Where, as here, the motions involve "[p]urely matters of contractual interpretation," they are "readily amenable to summary judgment." *LaPoint v. AmerisourceBergen Corp*., 2007 WL 1309398, at *3 (Del. Ch. May 1, 2007), *aff'd*, 956 A.2d 642 (Del. 2008) (TABLE).

## B. The Transaction Is Not Void Under the ROFR Agreement.

Richard's declaratory judgment claim is premised upon a breach of the ROFR Agreement. Richard alleges that the Transaction constituted a Deemed Liquidation Event, and Viking and Trux failed to comply with the notice and negotiation procedures under Section 2.5 of the ROFR Agreement. Richard also alleges that Viking breached Section 2.1(b) of the ROFR Agreement by failing to provide him with written notice of the terms and conditions of the Transaction within 60 days

---

[67] Effective June 1, 2026, Court of Chancery Rule 56 was amended. *See In re Amendments to Rules 46, 54–65.1, 67, 69–72, 77–78, 81–83, 85–88, and 100 of the Court of Chancery Rules, Titles VI–XII* (Del. Ch. May 18, 2026) (ORDER).

prior to the consummation of the Transaction. He contends that noncompliance with the terms of the ROFR Agreement renders the Transaction void *ab initio* under Section 2.4(a).[68]

Viking and Trux argue that Richard's motion must be denied, and that summary judgment should be granted in their favor because the Transaction was a Deemed Liquidation Event initiated by Viking, to which the notice requirements delineated in Section 2.1(b) and Section 2.5 are inapplicable. They also argue that Richard released his claims when he executed the Stock Purchase Agreement.

To resolve the competing motions, the court must construe contracts governed by Delaware law. The court construes the contract language from the perspective of "an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). The court will "read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021).

The court "must read the specific provisions of the contract in light of the entire contract." *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 913–14 (Del. 2017); *accord Johnson & Johnson v. Fortis Advisors LLC*,

---

[68] Cross-Claims ¶¶ 6, 60, 79; Richard's Opening Br. 30–31.

352 A.3d 229, 265–66 (Del. 2026). "The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan." *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012). "Courts should also assure that all contract provisions are harmonized and given effect where possible." *Samuel J. Heyman 1981 Continuing Tr. for Lazarus S. Heyman v. Ashland LLC*, 284 A.3d 714, 721 (Del. 2022) (citation modified). A reading of an agreement must be reasonable when the contract is "read in full and situated in the commercial context between the parties." *Chi. Bridge*, 166 A.3d at 926–27. But "the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement." *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018).

Richard's Cross-Claims rise or fall on the applicability of Section 2.4. Under Section 2.4(a), a Proposed Transfer that is "not made in compliance with the requirements of [the ROFR] Agreement shall be null and void ab initio."[69] According to Richard, his transfers of stock to Viking and those of the Selling Stockholders are void. As a consequence, he argues that the Seller's Release in his

---

[69] ROFR Agreement § 2.4(a).

Stock Purchase Agreement is unenforceable, and all equitable defenses are inapplicable.[70] Richard goes so far as to contend that he could invoke his own breach of the ROFR Agreement—several years after the Transaction—as a basis to void his sale to Viking along with those of the other Selling Stockholders.[71]

Richard's Cross-Claims fail as a matter of law. First, the Transaction was a series of sales of Transfer Stock pursuant to a Deemed Liquidation Event. Under Section 3.2 of the ROFR Agreement, "the provisions of Section 2 shall not apply to the sale of any Transfer Stock . . . pursuant to a Deemed Liquidation Event."[72] Because Richard's voidness theory relies on the application of Section 2.4(a), Section 3.2 forecloses his claim. Second, even if Section 3.2 did not foreclose

---

[70] *See* Richard's Opening Br. 30–31 ("Equity may neither intervene nor equitable defenses prevail where a contract is void *ab initio*." (citing *CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 817 (Del. 2018); *XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 592 (Del. Ch. 2022), *aff'd in part, rev'd in part*, 304 A.3d 896 (Del. 2023); *Absalom Absalom Tr. v. St. Gervais LLC*, 2019 WL 2655787, at *4 (Del. Ch. June 27, 2019); *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1046 (Del. 2014)).

[71] Richard insists he did not breach the ROFR Agreement and was under no obligation to provide notice pursuant to Section 2.1(b). *See* Dkt. 253 ("Richard's Supp. Br.") 7–8; Richard's Reply Br. 11. Yet he argues that, if Section 2.1(b) required him to provide notice, his failure to do so also voids the Transaction. *See* Richard's Opening Br. 15–19; Richard's Reply Br. 11. He further argues that claims seeking declaratory relief—including his challenge to the transfers—are categorically not subject to release or settlement. Richard's Supp. Br. 7–9; Dkt. 257 ("Second Oral Arg. Tr.") at 26–27 (arguing that declaratory judgment actions cannot be waived or subject to release).

[72] ROFR Agreement § 3.2.

Richard's theory, the Defendants did not breach Section 2.5 or Section 2.1(b). Third, and finally, Richard released his claims when he executed the Stock Purchase Agreement.

### 1.     The Transaction constituted a Deemed Liquidation Event.

Section 3.2 renders Section 2 inapplicable to any sale of Transfer Stock pursuant to a Deemed Liquidation Event. Richard has maintained throughout this litigation that Viking's acquisition of Trux stock in the Transaction constituted a Deemed Liquidation Event under the ROFR Agreement and the Amended Certificate. For example, in his verified Cross-Claims, Richard alleged that "Viking's proposal to purchase all outstanding shares of Trux in a series of related transactions constituted a Deemed Liquidation Event."[73] This is just one of several similar unequivocal allegations.[74] Richard took the same position in his opening

---

[73] Cross-Claims ¶ 4.

[74] *See, e.g.*, *id.* ¶ 50 ("Viking's March 27 Proposal to purchase all the outstanding shares of Trux (and subsequent offers) constituted a[] . . . Deemed Liquidation Event" and "triggered the Deemed Liquidation Event provisions of the Company's ROFR Agreement."); *id.* ¶ 73 (alleging that Viking's March 27 proposal constituted a Deemed Liquidation Event); *id.* ¶ 75 ("[T]he Proposed Transfers described above constituted a Deemed Liquidation Event" and "[a]s a Deemed Liquidation Event, these obligations fell squarely on Trux and Viking"); *id.* ¶ 90 ("Trux and Viking were aware that the series of transactions were a Deemed Liquidation Event and the ROFR Agreement's requirements had been violated."). This has been Richard's position since he filed his original cross-claims. *See* Dkt. 95 ¶¶ 4, 33, 38.

brief and at oral argument.[75] The Company agreed with Richard that "there's no question" the Transaction was a Deemed Liquidation Event "based upon the definition of that term" in the Amended Certificate.[76]

When confronted with Section 3.2, Richard reversed course. In his reply brief, he argued for the first time that the Transaction did not constitute a Deemed Liquidation Event.[77] Richard now contends that his sale to Viking and the sales of the Selling Stockholders were not "pursuant to" a Deemed Liquidation Event.[78]

---

[75] *See, e.g.*, Richard's Opening Br. 21 ("The Transaction was a Deemed Liquidation Event because Viking acquired ownership of Trux through a 'series of related transactions.'"); *id.* at 10 ("Viking's proposal was for 'the sale, transfer or other disposition, in a single transaction or series of related transactions, by the stockholders of the Corporation of a majority of the outstanding shares of capital stock of the Corporation (determined on an as-converted Common Stock basis),' and so fell squarely within the definition of a Deemed Liquidation Event.") (quoting Amended Certificate § 2.3.1(c)); *id.* at 20 ("The way Viking engineered the Transaction falls squarely within the definition of a 'Deemed Liquidation Event.'"); Dkt. 235 ("First Oral Arg. Tr.") at 12 ("Viking proposed a deemed liquidation event as it is described in the [A]mended [C]ertificate."); *id.* at 13 ("This was a deemed liquidation event."); *id.* at 14 ("All of these transactions were related and, therefore, it was a deemed liquidation event," and "[t]here is no question that it was a deemed liquidation event in Viking's mind either."); Second Oral Arg. Tr. at 4 ("[I]ndeed it was a deemed liquidation event."); *id.* at 6 ("Viking's final proposal . . . was, in fact, a deemed liquidation event."); *id.* at 7 ("There is no question that what Viking proposed was a deemed liquidation event."); *id.* at 9 ("[T]his was a deemed liquidation event."); *id.* at 29 ("[T]his was a deemed liquidation event.").

[76] First Oral Arg. Tr. at 39–40.

[77] Richard's Reply Br. 8–11. Richard did not mention Section 3.2 in his Cross-Claims or opening brief.

[78] Richard's Reply Br. 8–9.

Richard's newly minted argument directly contradicts his own pleadings and briefing, and it is contrary to the undisputed factual record.

The Amended Certificate defines a Deemed Liquidation Event as a "sale, transfer or other disposition, in a single transaction or series of related transactions, by the stockholders of the [Company] of a majority of the outstanding shares of capital stock of the [Company] (determined on an as-converted Common Stock basis)."[79] Viking's March 27 proposal sought to purchase all of Trux's outstanding stock that Viking did not already own.[80] After the Selling Stockholders and Richard sold their shares to Viking in response to the March 27 proposal, Viking's ownership in Trux increased from approximately 28% to over 80% pursuant to a series of related transactions in which stockholders of Trux transferred a majority of the outstanding shares of capital stock to Viking, as determined on an as-converted basis.[81] Richard presents no facts or any reasoned argument to suggest the Transaction was not a Deemed Liquidation Event as defined in the Amended

---

[79] Amended Certificate § 2.3.1(c).

[80] Ex. 8 at 2.

[81] Richard's Aff. ¶ 20; Ex. 11 at 2 (reflecting Viking's 82.2% ownership of Trux as of April 14, 2020); Cross-Claims ¶¶ 16, 73; Viking's Answer ¶¶ 16, 73; Trux's Answer ¶¶ 16, 73.

Certificate. There is no material issue of fact that the sales to Viking constituted a Deemed Liquidation Event.[82] As a result, Section 3.2 applies.

### 2. Section 3.2 forecloses Richard's reliance on Section 2.4(a).

Section 3.2 of the ROFR Agreement is clear and unambiguous: "Notwithstanding the foregoing or anything to the contrary herein, the provisions of Section 2 shall not apply to the sale of any Transfer Stock . . . pursuant to a Deemed Liquidation Event."[83] Section 2.4(a) is part of Section 2; therefore, Richard cannot invoke Section 2.4(a) as a basis to void the Transaction.

Richard acknowledges that a facial application of Section 3.2 would displace the notice requirements of Section 2. To avoid that result, Richard argues that Section 3.2 cannot be read to displace all of Section 2 because Sections 2.1(b), 2.3, and 2.5 also govern stock transfers or specifically reference the term "Deemed

---

[82] *See, e.g.*, Exs. 5 at 3 ¶ 3, 7 at 4 ¶ 3 (proposed written consents stating that the proposed transaction "would constitute a Deemed Liquidation Event" under the Amended Certificate); Ex. 8 at 1 (Trux's CEO stating to Richard that the March 27 proposal was for Viking "to acquire the capital stock of the Company."); *id*. at 2 (March 27 term sheet proposing to purchase outstanding shares of Trux); Ex. 9 at 1 (Third Written Consent stating: "Viking would acquire the issued and outstanding shares of the Company's capital stock from the Stockholders."); Ex. 11 at 2; *see also* Viking's Answer ¶ 16 ("Before the challenged transactions, Viking owned about 28.7% of Trux's stock"); Trux's Answer ¶ 16 (admitting same); Viking's Answer ¶ 73 (admitting to entering into the stock purchase agreements with the Selling Stockholders); Trux's Answer ¶ 73 (same); Richard's Aff. ¶ 20 ("Collectively, the other Stockholders and I purported to sell over 53% of Trux stock to Viking, which thereafter owned over 80% of the equity.").

[83] ROFR Agreement § 3.2(b).

Liquidation Event."[84]  He relies on the canon that, where provisions conflict, the specific provision controls over the general.[85]  Richard's arguments fail because no conflict exists and the provisions can be harmonized.  *Merck & Co., Inc. v. Bayer AG*, 2023 WL 2751590, at *11 (Del. Ch. Apr. 3, 2023) ("[T]he general/specific canon applies only where specific and general provisions conflict."), *aff'd*, 308 A.3d 1190 (Del. 2023) (TABLE); *Martin Marietta Mat'ls, Inc. v. Vulcan Mat'ls Co.*, 68 A.3d 1208, 1225 (Del. 2012) ("[A]ll contract provisions [should] be harmonized and given effect where possible.").

Section 2.1(b) is a procedural notice requirement that triggers the right-of-first-refusal waterfall under Section 2, thereby enabling Viking, the other Investors, and the Stockholders to exercise their sequential purchase rights.  By contrast, Section 3.2(b) displaces Section 2.1(b) once a transaction is, as here, characterized as a Deemed Liquidation Event under the Amended Certificate.  Any doubt whether a conflict exists between these provisions is resolved by the ROFR Amendment, which materially altered the Section 2 waterfall by removing the Viking Ownership Threshold, waiving the Investors' exercise procedures under Section 2.2(b), and

---

[84] Richard's Reply Br. 9–11.

[85] *Id.* at 10–11 (citing *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005); *AM Gen. Hldgs., LLC v. Renco Gp., Inc.*, 2020 WL 3484069, at *3 (Del. Ch. June 26, 2020)).

waiving the rights and procedures set forth in Section 2.2(c) through 2.2(f).[86]  Any notice therefore would have served no practical purpose because the parties entitled to receive notice—including Richard as a Closing Stockholder—had no remaining purchase rights to exercise.

The reference to a Deemed Liquidation Event in Section 2.3(d)(ii) poses no conflict, either.  Section 2.3(d)(ii) is a residual allocation mechanism that applies only if the right-of-first-refusal process has fully run its course,[87] shares remain on offer triggering co-sale rights, and the exercise of those rights causes the transaction midstream to constitute a Deemed Liquidation Event.[88]  It ensures that, in that limited scenario, the transaction's consideration is allocated in accordance with the

---

[86] Ex. 10.

[87] ROFR Agreement § 2.3(a) ("[I]f any Transfer Stock subject to a Proposed Transfer *is not purchased pursuant to Subsections 2.1 and 2.2* . . . respective Investor and Closing Stockholder may elect to exercise its Right of Co-Sale.") (emphasis added).

[88] *See id.* § 2.3(d)(ii) (providing that if the exercise of co-sale rights triggers "a Deemed Liquidation Event, the terms of the Purchase and Sale Agreement shall provide that the aggregate consideration . . . be allocated . . . in accordance with Sections 2.1 and 2.2 of Article IV(B) of the [Amended Certificate]").

liquidation preferences in the Amended Certificate.[89]   These provisions do not conflict, nor was Section 2.3 implicated here.[90]

Sections 2.5 and 3.2 also do not conflict.  First, the Transaction did not trigger Section 2.5 because Viking itself proposed the Deemed Liquidation Event.  Whether or how those provisions would interact in a transaction that actually implicates Section 2.5 is not presented here.  In any event, even if this were a transaction that implicated Section 2.5, the provisions can be harmonized because they address different stages.  Section 2.5 protects Viking's ability to participate in, or displace, a potential third-party Deemed Liquidation Event *before* the Company may proceed with that transaction.[91]   Section 3.2 would be implicated *after* the requirements of Section 2.5 have been fulfilled.  At that point, Section 3.2 applies to sales of Transfer

---

[89] The provision ensures that, if the exercise of co-sale rights triggers a Deemed Liquidation Event, the allocation of consideration is anchored in the Amended Certificate's liquidation waterfall and is not bypassed by Section 2.3(d)(i)'s co-sale allocation mechanics.  *Compare id*. § 2.3(d)(i), *with id*. § 2.3(d)(ii).

[90] Richard has not explained how co-sale rights could attach to a transaction where Viking seeks to acquire all of Trux's outstanding shares.

[91] *See* ROFR Agreement § 2.5(a) (requiring notice to Viking for a "potential" or "unsolicited indication of interest for a Deemed Liquidation Event" with a third party); *see also id*. § 2.5(c)–(d) (providing that only if Viking does not exercise its rights may the Company "be free to consummate the Deemed Liquidation Event with the applicable third party").

Stock made pursuant to that Deemed Liquidation Event and eliminates the applicability of "the provisions of Section 2" to those sales.

Richard does not offer any construction or interpretation of the ROFR Agreement, let alone a persuasive one, that requires rendering Section 3.2 inapplicable. The court cannot read the provision out of the ROFR Agreement. *See In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56 (Del. 2019) (observing that Delaware courts interpret contracts "so as not to render any part of the contract mere surplusage, and will not read a contract to render a provision or term meaningless or illusory" (citation modified)); *Intel Corp. v. Am. Guarantee & Liab. Ins. Co.*, 51 A.3d 442, 451 (Del. 2012) ("[N]o part of an agreement should be rendered superfluous."); *Star Am. Rail HoldCo, LLC v. Cathcart*, 2024 WL 5239938, at *9 (Del. Ch. Dec. 17, 2024) (adopting as the only reasonable interpretation of a contract the reading that "gives meaning and effect to each of the contract's terms" and rejecting an "interpretation [that] created multiple inconsistencies"); *see also* Restatement (Second) of Contracts § 203(a) (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").

The Transaction was a series of related sales of Transfer Stock pursuant to a Deemed Liquidation Event. Therefore, under Section 3.2, "the provisions of Section 2 shall not apply." Section 2.4(a) is a provision of Section 2. The remedy that Richard seeks—voiding the Transaction—depends entirely on the application of Section 2.4(a).[92] Because Section 3.2 renders Section 2.4 inapplicable, Richard is not entitled to an order declaring the Transaction void *ab initio*.[93]

### 3. Section 2.5 of the ROFR Agreement was not triggered or breached.

The parties do not dispute that Viking and the Company did not follow Section 2.5's notice and negotiation procedures. The dispute instead concerns whether the Transaction required compliance with those procedures. Viking and Trux argue that Section 2.5 was not triggered because Viking initiated the Deemed

---

[92] Viking and Trux argue that, even if Section 2.4(a) applies, the Seller's Release remains enforceable under the Stock Purchase Agreement's severability clause and therefore bars Richard's claims. Trux's Opening Br. 12–17; Viking's Opening Br. 8–12. Because the court holds that Section 2.4(a) is not applicable, it need not reach this argument.

[93] This conclusion would follow even if Richard were correct that other provisions of Section 2 somehow applied and imposed obligations that were not satisfied. Richard offers no argument as to why or how Section 3.2 would be inapplicable to Section 2.4. At a minimum, the inapplicability of Section 2.4 to the Deemed Liquidation Event defeats Richard's attempt to have the Transaction declared void *ab initio*.

Liquidation Event, rather than Trux or a third party.[94]  The court agrees.  Section 2.5 therefore cannot serve as a basis for Richard to void the Transaction.

When read in the context of the entire agreement, Section 2.5 protects Viking when the Company or a third party pursues a potential Deemed Liquidation Event. It is designed to protect Viking, not impose obligations on Viking vis-à-vis the Stockholders.  Section 2.5 grants Viking a suite of layered protective measures, ensuring that Viking receives prompt notice of any potential third-party transaction so Viking may initiate exclusive negotiations, and a second notice and matching rights before the Company may proceed with a third-party transaction.[95]

The notice and matching rights of Section 2.5 protect Viking when the Company or a third party initiates a transaction.  They are among several components of the ROFR Agreement's broader framework to ensure Viking's priority rights of first refusal for stock transfers.[96]  The notice and negotiation procedures in Section 2.5 serve no purpose when Viking itself proposes the transaction.  *See E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108,

---

[94] Viking's Opening Br. 4; Trux's Opening Br. 12 (incorporating and adopting Viking's opening brief).

[95] *See* ROFR Agreement § 2.5(a), (c)–(d).

[96] *See id.* § 2.1(a).

1113 (Del. 1985) (recognizing a particular portion of an agreement should be interpreted consistent with the agreement's overall scheme or plan); *Chi. Bridge*, 166 A.3d at 926–27 (observing a court's interpretation must be reasonable when "read in full and situated in the commercial context between the parties," as "[t]he basic business relationship between [the] parties must be understood to give sensible life to any contract").

Section 2.5(a) is not triggered when Viking initiates the transaction because it is not the Company that "desires to explore a potential Deemed Liquidation Event"; it is Viking.[97] Nor did a Stockholder "receive an unsolicited offer" for a Deemed Liquidation Event necessitating notice to Viking.[98] Reading Section 2.5 to apply in the reverse posture would produce an unreasonable and commercially incoherent result. But that is how Richard interprets Section 2.5. Richard argues that, once Viking delivered its proposed term sheet, it was Trux that then "desire[d] to explore a potential Deemed Liquidation Event," triggering Section 2.5's notice requirements. According to Richard, Trux was required to deliver a Potential Sale Notice to Viking, giving Viking notice of its own proposal, and Viking was then obligated to issue a Negotiation Notice back to Trux.

---

[97] *Id.* § 2.5(a).

[98] *Id.*

Richard's reading isolates the first sentence of Section 2.5(a) and divorces it from its context. *See SeaWorld Ent., Inc. v. Andrews*, 2023 WL 3563047, at *5 (Del. Ch. May 19, 2023) ("Words do not exist in isolation. So contracts cannot be construed in isolation either. Quite the opposite."), *aff'd*, 314 A.3d 662 (Del. 2024) (TABLE). Richard converts Section 2.5 from a provision designed to protect Viking into an empty, circular notice regime untethered to any commercial purpose. *See Manti Hldgs.*, 261 A.3d at 1211 ("[I]nterpretations that are commercially unreasonable . . . must be rejected."); *Bank of NY Mellon v. Commerzbank Cap. Funding Tr. II*, 65 A.3d 539, 555 (Del. 2013) (holding that construction of a contract that "would lead to an illogical sequence of events" was not reasonable); *see also Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *9 (Del. Ch. Sep. 18, 2014) (observing that the court "should avoid interpreting a term in an unreasonable way that would yield an absurd result."). Richard's interpretation of Section 2.5 is not reasonable or aligned with the provision's intended purpose.

Because Viking initiated the Transaction that constituted the Deemed Liquidation Event, Section 2.5 was not implicated. Therefore, Viking and Trux did not breach Section 2.5, and that provision cannot serve as a basis to void the Transaction.

> **4.    Section 2.1(b) of the ROFR Agreement was not breached.**

Richard alleges that Viking breached the notice obligations under Section 2.1(b), requiring the Transaction to be declared void under Section 2.4(a). That claim fails for two reasons.  First, as discussed above, Section 3.2 eliminated the notice obligations otherwise imposed by Section 2.1(b).  Second, Richard's claim relies upon an unreasonable reading of Section 2.1(b).

Section 2.1(b) imposes an obligation on "[e]ach Stockholder proposing to make a Proposed Transfer" to provide a Proposed Transfer Notice identifying the terms and the Proposed Transferee to each Closing Stockholder.[99]  The definition of "Proposed Transfer" applies to "any assignment, sale, offer to sell, pledge, mortgage, hypothecation, encumbrance, disposition of or any other like transfer or encumbering of any Transfer Stock . . . proposed by any Stockholder."[100]

Richard argues that Viking's proposal to "*acquire* Trux stock" constituted a "Proposal to make a Proposed Transfer," requiring it to send a Proposed Transfer Notice.[101]  But, as Richard acknowledges, Viking did not "propos[e] to make" a

---

[99] *Id.* § 2.1(b).

[100] *Id.* § 1.12.

[101] Richard's Opening Br. 16 (emphasis added); *id*. n.13 (arguing "[e]ach time Viking *offered to acquire* Trux shares, it was required to send a Proposed Transfer Notice because it was proposing 'to make' a transfer.") (emphasis added).

"sale," an "offer to sell," or a "like transfer" of its Trux shares. Rather, Viking proposed to *acquire* other Stockholders' shares. A proposal to acquire shares is not a proposal to sell shares.

Richard's argument ignores the ROFR Agreement's distinction between a proposed transferor and a Prospective Transferee. If Section 2.1(b) were applicable, Viking would have been the Prospective Transferee. Under Richard's interpretation, Section 2.1(b) would have required Viking, as the Proposed Transferee, to issue a Proposed Transfer Notice to Trux, itself, each Investor, and each Closing Stockholder identifying itself as the Prospective Transferee, expressing its intent to acquire all of Trux's shares, and disclosing the proposed terms, only to then issue a second notice to that same group stating its intent to exercise its rights of first refusal to purchase those very same shares.[102] Again, this creates obligations not grounded in the ROFR Agreement and serves no discernible purpose. Richard's interpretation is untenable, particularly in light of the ROFR Amendment, which waived the exercise procedures and downstream purchase rights otherwise available to parties subordinate to Viking in the Section 2 waterfall, rendering the corresponding notice requirements to Closing Stockholders such as Richard otiose.

---

[102] *See* ROFR Agreement § 2.1(b).

Richard's interpretation inverts the contractual roles established by Sections 2.1(a) and 2.1(b), renders the distinction between transferor and transferee meaningless, creates circular procedural requirements without operative effect, and contorts the language of those provisions. *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) ("Absent some ambiguity, Delaware courts will not destroy or twist [contractual] language under the guise of construing it."); *accord AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

Thus, Viking did not breach Section 2.1(b), even ignoring Section 3.2.[103]

---

[103] Richard contends that the court has already determined that any failure to provide notice under Section 2.1(b) requires that the Transaction be deemed void. *See* Richard's Opening Br. 14, 17–20; Richard's Reply Br. 11–12. For this, he relies on the court's decision denying the motions to dismiss Gower's complaint. In denying those earlier motions to dismiss Gower's complaint, the court concluded that the alleged failure of the Selling Stockholders to provide Gower notice under Section 2.1(b) stated a claim for breach of the ROFR Agreement. *See Gower v. Trux, Inc.*, 2022 WL 534204, at *8 (Del. Ch. Feb. 23, 2022). That ruling does not control here. The motion to dismiss decision was rendered at the pleadings stage, on different allegations, on a more limited record, and based on different arguments. Neither the term "Deemed Liquidation Event" nor Section 3.2 was raised in Gower's operative complaint, the motion to dismiss briefing, or at oral argument. The parties likewise did not address the Amended Certificate. Therefore, the prior decision did not decide whether the challenged transaction constituted a Deemed Liquidation Event under the Amended Certificate, how the ROFR Agreement operates when Viking initiates a Deemed Liquidation Event, or the effect of provisions of the ROFR Agreement— including Sections 2.1, 2.5, and 3.2—in that setting. As a consequence, the prior ruling does not constrain the court's analysis of Richard's claims on the present motions. *See State v. Wright*, 131 A.3d 310, 321 n.44 (Del. 2016) ("The law of the case doctrine . . . only

###### C. Richard Released His Claims.

When Richard accepted the March 27 proposal, he executed a Stock Purchase Agreement. That agreement includes the Seller's Release, which released "any and all" claims "of every kind and nature whatsoever," including those "based on acts, events or omissions occurring on or prior to this Agreement" and "relating to the Seller's ownership of the Shares."[104]

"Delaware courts recognize the validity of general releases." *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1163 (Del. 2010), *cert. denied*, 563 U.S. 938 (2011). "[W]here the language of the release is clear and unambiguous, it will not lightly be set aside." *Adams v. Jankouskas*, 452 A.2d 148, 156 (Del. 1982). "An effective release terminates the rights of the party executing and delivering the release and is a bar to recovery on the claim released." *Seven Invs., LLC v. AD Cap., LLC*, 32 A.3d 391, 396 (Del. Ch. 2011) (citation modified).

---

applies to issues the court actually decided" and "usually require[s] the issue to have been fully briefed and squarely decided in the prior proceedings," assuming "the facts underlying the ruling [have] not change[d]."); *Kenton v. Kenton*, 571 A.2d 778, 784 (Del. 1990) ("The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation.").

[104] Ex. 13 § 10.

Richard's sole argument challenging the validity of the Seller's Release is predicated on the Transaction and his Stock Purchase Agreement being declared void *ab initio* under Section 2.4(a). As explained above, Section 2.4(a) is inapplicable to the Transaction. As a result, the Stock Purchase Agreement is a valid and enforceable contract.

The Seller's Release unambiguously encompasses Richard's claims. Richard's claims are predicated on alleged breaches of the ROFR Agreement in connection with the sale of his shares and events preceding the Stock Purchase Agreement. Those claims fall squarely within this category of released, ownership-related claims.

Under Delaware law, the clear and unambiguous Seller's Release is enforceable and requires dismissal of Richard's claims. *See Seven Invs.*, 32 A.3d at 396 ("If the claim falls within the plain language of the release, then the claim should be dismissed.").

## III.  CONCLUSION

Richard's motion for summary judgment is DENIED, and Defendants' motions for summary judgment are GRANTED.

IT IS SO ORDERED.

Very truly yours,

*/s/ Paul A. Fioravanti, Jr.*

Vice Chancellor